### A10A2054, A10A2055. CITY OF ATLANTA v. CITY OF COLLEGE PARK et al.; and vice versa.

(715 SE2d 158)

ELLINGTON, Chief Judge.

In this declaratory judgment action pending in the Superior Court of Fulton County, the City of Atlanta and the City of College Park each claim the right to tax businesses that operate in the parts of the Hartsfield-Jackson Atlanta International Airport that lie within the city limits of College Park. After a hearing on the parties' cross-motions for partial summary judgment, the trial court determined that only College Park is authorized to levy, assess, and collect an occupation tax on businesses operating at the airport within its city limits. The trial court also determined that only College Park is authorized to impose and collect taxes on the sale, storage, and distribution of alcoholic beverages at the airport within its city limits. Accordingly, the trial court granted a declaratory judgment in favor of College Park on these issues. The trial court determined, however, that Atlanta is a local authority that is statutorily exempt from liability for any occupation tax for its proprietary business operations within College Park's city limits. Accordingly, the trial court granted a declaratory judgment in favor of Atlanta on this issue. In Case No. A10A2054, Atlanta appeals the trial court's rulings regarding College Park's authority to collect alcoholic beverage and occupation taxes on activities at the airport, and, in Case No. A10A2055, College Park cross-appeals the trial court's determination that Atlanta is exempt from any occupation tax for its proprietary activities. In Case No. A10A2054, for the reasons explained below, we affirm in part (see Division 1, infra) and vacate in part (see Division 3, infra). In Case No. A10A2055, we reverse in part (see Division 2, infra).[1]

The following facts are undisputed. In 1969, College Park conveyed land to Atlanta, in connection with Atlanta's expansion of the airport, which it owns and operates. The cities agreed, in Section 18 of that contract, as follows:

> With respect to any and all buildings and structures located or constructed on property of the Atlanta Airport, exclusive jurisdiction over the issuance of permits, the collection of license and occupation taxes and fees, the inspection of properties, the enforcement of building codes and fire codes,

---

[1] The Supreme Court of Georgia determined that the constitutionality of a law or ordinance has not been drawn into question on appeal and, therefore, that subject matter jurisdiction over these appeals lies with this Court.

and all similar matters shall vest in the City of Atlanta. Personal property, inventory and leasehold interest in property lying within the corporate limits of the City of College Park and belonging to parties other than the City of Atlanta, however, shall be subject to reasonable ad valorem tax by the City of College Park, to the extent permitted by law.

Thereafter, Atlanta collected an occupation tax, which is a local tax on professional and business activities,[2] from the rental car companies and other businesses that operated on airport property located in College Park.

In 2007, College Park reviewed the issue of its authority to collect occupation and alcoholic beverage taxes and concluded that it is the sole proper authority to levy and collect these taxes within its city limits. College Park notified Atlanta that it intended to begin assessing and collecting an occupation tax from businesses operating at the airport in College Park, including from the City of Atlanta itself for revenues generated from its proprietary operations at the airport. After College Park notified a few of the affected businesses about the tax, Atlanta filed suit against College Park and its city manager in his official capacity, seeking a declaratory judgment, an injunction, and other relief.

On the issue of the occupation tax, Atlanta, in Count 1 of its complaint, as amended, asked the trial court to declare

> that the 1969 Agreement controls the collection of occupation taxes from businesses operating in the portion of the Airport located within the corporate boundaries of College Park and that College Park's attempt to collect occupation taxes from these businesses constitutes a violation of the terms of the 1969 Agreement.[3]

In Count 1 of College Park's counterclaim, it asked the court to declare, instead, that *it* is "the proper authority for the assessment and collection of occupation taxes on businesses operating in the portion of the Airport located within the corporate limits of the City of College Park[,]" that portions of the 1969 Agreement are "illegal, unenforceable, of no current legal [e]ffect[,] and not binding upon the parties[,]" and that "Section 7-105 (f) of the Charter for the City

---

[2] OCGA § 48-13-5 (4) (defining an occupation tax as "a tax levied on persons, partnerships, corporations, or other entities for engaging in an occupation, profession, or business and enacted by a local government as a revenue-raising ordinance or resolution").

[3] In Count 4, Atlanta sought damages for College Park's alleged breach of the contract.

of Atlanta[4] . . . is unconstitutional, illegal[,] and unenforceable." In Count 3, College Park asked the court to declare that "Atlanta is subject to College Park's occupation tax on [Atlanta's] proprietary operations at the Airport that occur within the corporate limits of College Park."

On the issue of alcoholic beverage taxes, College Park asked the court to declare, in Count 6 of its counterclaim, that it "is the sole legitimate authority for the levying and collection of all taxes related to the sale, storage, or distribution of alcoholic beverages in the portions of [the Airport] that are within the corporate limits of the City of College Park."

On the issue of the occupation tax, the trial court determined that the 1969 Agreement is unenforceable to the extent it purports to authorize Atlanta to collect taxes outside of its territorial limits. In addition, the trial court concluded that Section 7-105 (f) of Atlanta's charter is unconstitutional to the extent it purports to remove from College Park the authority to collect an occupation tax from businesses within its city limits but located on airport property. Based on these conclusions, the trial court declared that only College Park is authorized to levy, assess, and collect an occupation tax from businesses operating at the airport within its city limits. The trial court granted partial summary judgment in favor of College Park on Count 1 of its counterclaim and on Counts 1 and 4 of Atlanta's amended complaint, and denied Atlanta's corresponding motion for partial summary judgment. The trial court determined, however, that Atlanta is a "local authority" and, therefore, that it is statutorily exempt from liability to College Park for any occupation tax for its (Atlanta's) proprietary business operations. Accordingly, the trial court granted partial summary judgment in favor of Atlanta on Count 3 of College Park's counterclaim and denied College Park's motion for partial summary judgment on that issue.

On the issue of alcoholic beverage taxes, the trial court determined that only College Park is authorized to impose and collect taxes on the sale, storage, and distribution of alcoholic beverages at the airport within its city limits. The trial court granted partial summary judgment in favor of College Park on Count 6 of its counterclaim. The court ordered Atlanta to "refund amounts collected in error" for the years 2007 through 2010.[5]

---

[4] Section 7-105 (f) of Atlanta's charter provides that no municipality or town other than Atlanta shall have any authority, although the land may be located within the other municipality's or town's limits, to charge or exact any license fees or occupation taxes for the operation by the City of Atlanta of a landing field therein or for the operation or conduct of any business or occupation thereon. Ga. L. 1996, pp. 4469, 4547-4548.

[5] The trial court reserved for later determination the remaining issues that were raised

1. Atlanta contends that the trial court erred in ruling that the 1969 Agreement is unenforceable and in ruling that only College Park is authorized to levy, assess, and collect an occupation tax from businesses operating at the airport within its city limits. We review the record de novo to determine whether the undisputed facts warrant summary judgment on this issue.[6]

(a) Under Georgia law, a municipal corporation can exercise the power of taxation only to the extent the power to do so is "plainly and unmistakably granted by the State[.]" (Citations omitted.) *City of Atlanta v. Gower*, 216 Ga. 368, 370 (116 SE2d 738) (1960). "[T]he burden is upon every political subdivision of the State which demands taxes from the people to show authority to exercise [the power of taxation] in the manner in which it has been imposed by a valid law of this State." (Citations omitted.) Id. Georgia's Constitution specifies that, generally, such a grant of the power of taxation by a local government shall be by the "Constitution or by general law." Ga. Const. of 1983, Art. IX, Sec. IV, Par. I (a).[7] The General Assembly adopted such a general law regarding the so-called "occupation tax," providing, in pertinent part, that

the governing authority of each municipal corporation is authorized but not required to provide by local ordinance or resolution for the levy, assessment, and collection of occupation tax on those businesses and practitioners of professions and occupations which have one or more locations or offices within the corporate limits [of the municipality].

OCGA § 48-13-6 (b).[8] By its plain terms, OCGA § 48-13-6 (b) author-

---

in the pleadings.

[6] In order to prevail on a motion for summary judgment under OCGA § 9-11-56, the moving party must show that there exists no genuine issue of material fact, and that the undisputed facts, viewed in the light most favorable to the nonmoving party, demand judgment as a matter of law. Moreover, on appeal from the denial or grant of summary judgment the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. (Citations omitted.) *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006).

[7] (a) Except as otherwise provided in [Ga. Const. of 1983, Art. IX, Sec. IV, Par. I], the governing authority of any county, municipality, or combination thereof may exercise the power of taxation as authorized by this Constitution or by general law.
(b) In the absence of a general law: . . .
(2) Municipal governing authorities may be authorized by local law to levy and collect taxes and fees in the corporate limits of the municipalities.
Ga. Const. of 1983, Art. IX, Sec. IV, Par. I.

[8] The General Assembly also authorized counties to levy, assess, and collect an occupation tax, but only on businesses and practitioners that have locations or offices within the unincorporated part of the county. OCGA § 48-13-6 (a).

izes a municipality to collect an occupation tax only on businesses and practitioners located within its city limits.

Despite this statutory language, Atlanta contends that it is authorized by the 1969 Agreement to collect an occupation tax on professional or business activities that are conducted at the airport even though the activities occur within College Park's city limits. A contract between municipalities, however, is not a general law. We find no basis for concluding that such a contract can vest the governing authority of a municipality with the power of extraterritorial taxation. See Ga. Const. of 1983, Art. IX, Sec. IV, Par. I (b) (2) (In the absence of a general law, a municipal governing authority may levy and collect taxes and fees only within the corporate limits of the municipality.).[9] We conclude, therefore, that, to the extent the 1969 Agreement purported to vest in Atlanta the authority to collect an occupation tax on businesses located within College Park's city limits, the contract is unenforceable.[10] Because Atlanta has not identified any constitutional provision or general law[11] that authorizes it to levy, assess, and collect an occupation tax on businesses and practitioners that are not located in its city limits, Atlanta failed to carry its burden of showing that it has any authority to require businesses to pay it an occupation tax for their activities at the airport that are conducted within College Park's city limits. Although we have not adopted the trial court's analysis in its entirety, therefore, we agree that Atlanta lacks authority to collect an occupation tax on professional or business activities within College

---

[9] See also *Garr v. E. W. Banks Co.*, 206 Ga. 831 (1) (59 SE2d 400) (1950) ("The right of taxation is a sovereign right — inalienable, indestructible — is the life of the State, and rightfully belongs to the people in all Republican governments, and neither the General Assembly, nor any, nor all other departments of the Government established by this Constitution, shall ever have the authority to irrevocably give, grant, limit, or restrain this right; and all laws, grants, contracts, and all other acts, whatsoever, by said government, or any department thereof, to affect any of these purposes, shall be, and are hereby, declared to be null and void, for every purpose whatsoever; and said right of taxation shall always be under the complete control of, and revocable by, the State, notwithstanding any gift, grant or contract, whatsoever, by the General Assembly. The power to tax corporations and corporate property, shall not be surrendered or suspended by any contract, or grant to which the State shall be a party.") (quoting Ga. Const. of 1945, Art. VII, Sec. I, Par. I) (punctuation omitted).

[10] We note that Atlanta argued at length that the 1969 Agreement is not prohibited by OCGA § 36-30-3, which provides that "[o]ne [city] council may not, by an ordinance, bind itself or its successors so as to prevent free legislation in matters of municipal government." Because the 1969 Agreement is unenforceable to the extent it purports to authorize Atlanta to levy, assess, and collect an extraterritorial tax, however, as we have explained, this argument presents no basis for reversing the trial court's ruling on this issue.

[11] We note that Atlanta "does not, and has not[,] claimed that [Section 7-105 (f) of its city charter, see n. 4, supra,] independently vests Atlanta with the right to collect occupation taxes at the airport. For purposes of this appeal, [Atlanta contends,] the issue of collection of occupation taxes requires an analysis of the 1969 Agreement and nothing more." Further, we note that a city charter is a local law, not a general law. See Charles R. Sheppard, Handbook on Georgia Practice with Forms, § 3-3 (2010-2011 ed.).

Park's city limits. Thus, we affirm the trial court's ruling on the cities' respective motions for partial summary judgment on this issue.[12]

(b) Having determined that Atlanta lacks authority to collect an occupation tax on professional or business activities within College Park's city limits, we turn to the issue of whether College Park has authority to collect an occupation tax from businesses and practitioners operating at the airport. It is undisputed that College Park provided by local ordinance for the levy, assessment, and collection of an occupation tax on businesses and practitioners operating within its city limits. Thus, as Atlanta concedes, College Park has the general authority to collect such a tax under OCGA § 48-13-6 (b).

We note that College Park's plan to collect an occupation tax from airport businesses operating within its city limits conflicts with Atlanta's charter, which provides that no municipality or town other than Atlanta can collect an occupation tax for the operation of businesses at the airport. See n. 4, supra. The General Assembly did not, however, in a separate act, amend *College Park's* charter to provide a corresponding limitation on College Park's exercise of the power of taxation under OCGA § 48-13-6 (b). "It is not competent for the General Assembly in one act to amend, repeal, or modify the charters of two separate and distinct municipal corporations, and to attempt to do so causes the act to refer to more than one subject-matter" in violation of Georgia's Constitution.[13] (Citations omitted.) *Schneider v. City of Folkston*, 207 Ga. 434, 435 (1) (a) (62 SE2d 177) (1950). Thus, we conclude that Section 7-105 (f) of Atlanta's charter is ineffective to the extent it purports to divest College Park of the authority to levy, assess, and collect an occupation tax on those businesses and practitioners operating at the airport and within its city limits. See also OCGA § 48-13-6 (b) ("This article supersedes any provision of local law or city charter authorizing such taxes.").

Apart from Section 18 of the 1969 Agreement, which is unenforceable for the reasons explained above, nothing in the record shows that College Park granted an exemption from the tax to airport businesses pursuant to any ordinance or other binding mechanism. We conclude, therefore, that College Park (and only College Park) is authorized to levy, assess, and collect an occupation

---

[12] "A grant of summary judgment must be affirmed if right for any reason, whether stated or unstated. It is the grant itself that is to be reviewed for error, and not the analysis employed." (Citation and punctuation omitted.) *La Quinta Inns v. Leech*, 289 Ga. App. 812, 819 (2) (658 SE2d 637) (2008).

[13] See Ga. Const. of 1983, Art. III, Sec. V, Par. III ("No bill shall pass which refers to more than one subject matter or contains matter different from what is expressed in the title thereof."), formerly Ga. Const. of 1976, Art. III, Sec. VII, Par. IV; Ga. Const. of 1945, Art. III, Sec. VII, Par. VIII.

tax from businesses and practitioners at the airport that are located within its city limits, to the extent consistent with Ga. Const. of 1983, Art. IX, Sec. IV, Par. I, OCGA § 48-13-6 (b), other applicable statutes, and its own charter, ordinances, and regulations.[14] Accordingly, the trial court did not err in granting partial summary judgment in favor of College Park and against Atlanta on Count 1 of College Park's counterclaim and on Counts 1 and 4 of Atlanta's amended complaint.

2. College Park contends that the trial court erred in determining that Atlanta is a local authority that is statutorily exempt from liability to College Park for any occupation tax for its (Atlanta's) proprietary business operations.[15] We agree.

Under OCGA § 48-13-13 (5), "[l]ocal governments are not authorized to . . . [l]evy any occupation tax, regulatory fee, or administrative fee on any state or local authority[.]" The question presented in this case is whether Atlanta is a "local authority" within the meaning of that statute, such that College Park is prohibited from taxing it. The statute does not define "state or local authority," however, and, therefore, the threshold issue is whether the term is plain and unequivocal or whether it is ambiguous. If the General Assembly uses "plain and unequivocal language" in a statute, interpretation of the words used or other judicial construction of the statute is both unnecessary and forbidden. *Sawnee Elec. Membership Corp. v. Ga. Public Svc. Comm.*, 273 Ga. 702, 705 (544 SE2d 158) (2001). Thus, when a statute is "plain and susceptible of

---

[14] We note that some businesses and practitioners with multiple locations at the airport may owe an occupation tax to both Atlanta and College Park. See OCGA § 48-13-14 (allocation of gross receipts for occupation tax purposes for businesses and practitioners with locations or offices situated in more than one jurisdiction).

[15] Under Georgia law, when Atlanta acts in its capacity as a lessor at the airport for the purpose of obtaining revenue, it is acting in a proprietary capacity and not carrying out a governmental function. See *Clayton County Bd. of Tax Assessors v. City of Atlanta*, 286 Ga. App. 193, 197, 201-203 (3), (4) (648 SE2d 701) (2007) (The City of Atlanta, which owned a convention center in Clayton County and in turn leased the property to the City of College Park, was not exempt from the county's ad valorem tax on the basis that it had bought the property from the tax-exempt College Park Business and Industrial Development Authority. Nor was the city exempt under OCGA § 48-5-41 (a) (1) (B) on the basis that its use of the property was for a governmental or public purpose, because the city acted solely in its proprietary capacity "as a regular commercial entity" for the purpose of generating profit for the city.) (citation and punctuation omitted); *Caroway v. City of Atlanta*, 85 Ga. App. 792, 795-798 (1) (70 SE2d 126) (1952) (The City of Atlanta, which leased out portions of its municipal airport passenger terminal building for the purpose of obtaining revenue, was engaged in a proprietary function and, therefore, was subject to liability as a premises owner.); see also OCGA § 48-5-4 (Except as prohibited by federal law, "all property owned or possessed in this state by a corporation organized under the laws of the United States or owned or possessed by an agency of the United States engaged in this state in proprietary, as distinguished from governmental, activities shall be subject to ad valorem taxation in this state at the same rate and in the same manner as the property of private corporations owning property in this state and engaged in similar businesses.").

but one natural and reasonable construction," a court must simply follow the literal language of the statute, unless doing so would "lead[ ] to absurd or wholly impracticable consequences[.]" (Punctuation and footnote omitted.) *Carolina Tobacco Co. v. Baker*, 295 Ga. App. 115, 119 (1) (670 SE2d 811) (2008). See also *Judicial Council of Ga. v. Brown & Gallo, LLC*, 288 Ga. 294, 297 (702 SE2d 894) (2010) ("[T]he 'golden rule' of statutory construction requires [courts] to follow the literal language of [a] statute unless it produces contradiction, absurdity, or such an inconvenience as to insure that the legislature meant something else.") (citation and punctuation omitted).

In the Georgia Code, the term "local authorities" is used in some contexts to refer to municipalities or counties, that is, units of local government which are political divisions of the state and which have traditional powers of sovereignty such as taxation.[16] The term "authority" is used in other contexts, however, to refer to an agency of such a local government that carries out certain functions on behalf of one or more local governments, for example, a local hospital or housing authority.[17] We conclude, therefore, that the term "local authority" in the context of OCGA § 48-13-13 (5) is ambiguous.

"Where the language of a statute is capable of more than one meaning, we construe the statute so as to carry out the legislative

---

[16] See, e.g., *Akin v. Hardison*, 245 Ga. 57, 58-59 (262 SE2d 814) (1980) (For purposes of former Code Ann. § 68A-1503 (currently OCGA § 40-6-372), which authorizes "[l]ocal authorities" by ordinance to adopt en masse the Uniform Rules of the Road, a municipality is a local authority.); OCGA §§ 40-5-53 (b) (requiring every court in each county of this state that has jurisdiction over traffic offenses under state law "or any other law of this state or ordinance adopted by a local authority" to forward to the Department of Driver Services any suspended driver's license); 40-6-374 (form for adopting Uniform Rules of the Road that equates "[l]ocal authorities" with municipalities or counties); see also Ga. Const. of 1983, Art. IX, Sec. I, Par. I ("Each county shall be a body corporate and politic with such governing authority and with such powers and limitations as are provided in this Constitution and as provided by law."); Ga. Const. of 1983, Art. IX, Sec. II, Pars. I (conferring home rule for counties); II (authorizing the General Assembly to provide for self-government for municipalities); Ga. Const. of 1983, Art. IX, Sec. IV, Par. I (authorizing the governing authority of any county, municipality, or combination thereof to exercise the power of taxation as authorized by the Constitution, by general law, or by local law with certain limitation.); *Peacock v. Ga. Municipal Assn.*, 247 Ga. 740, 742 (2) (279 SE2d 434) (1981) (The taxing power of a municipality is generally set out in its charter, subject to limitations and preemptions imposed by the Constitution and by general law.).

[17] *Cox Enterprises v. Carroll City/County Hosp. Auth.*, 247 Ga. 39, 43-45 (273 SE2d 841) (1981) (A city-county hospital authority, which carried out essential governmental functions delegated to it by the city and county that created it, was a distinct corporate entity from those local governments and lacked some of the attributes of sovereignty, such as the power to tax.); *Hawes v. Lockheed Aircraft Corp.*, 118 Ga. App. 222, 223 (162 SE2d 896) (1968) (An "authority" is "an agency of one or more participating governmental units created by statute for the specific purpose of having delegated to it certain functions governmental in character" and "is not a political subdivision unless recited to be so in the pertinent constitutional or statutory instruments creating it.") (citations, punctuation and emphasis omitted); *Richmond County Hosp. Auth. v. McLain*, 112 Ga. App. 209, 210-212 (144 SE2d 565) (1965) (accord).

intent." (Citation omitted.) *Judicial Council of Ga. v. Brown & Gallo, LLC*, 288 Ga. at 297. The "cardinal rule" of statutory construction is "to ascertain the legislative intent and purpose in enacting the law[ ] and then to give it that construction which will effectuate the legislative intent and purpose." (Citation and punctuation omitted.) *Sawnee Elec. Membership Corp. v. Ga. Public Svc. Comm.*, 273 Ga. at 704. See also OCGA § 1-3-1 (a) ("In all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy."). In interpreting OCGA § 48-13-13 (5), certain principles of statutory construction are particularly helpful. A court should consider one statute in the context of other related statutes, reading all related statutes together "so as to ascertain the legislative [intent] and give effect thereto." (Citation and punctuation omitted.) *Goldberg v. State*, 282 Ga. 542, 546 (651 SE2d 667) (2007). Similarly, "in construing language in any one part of a statute, a court should consider the entire scheme of the statute and attempt to gather the legislative intent from the statute as a whole." (Citation and punctuation omitted.) *Footstar, Inc. v. Liberty Mut. Ins. Co.*, 281 Ga. 448, 450 (637 SE2d 692) (2006).

OCGA § 48-13-13, in addition to the prohibition of occupation taxes on a "local authority" that is at issue here, provides several other limitations on the levy of such a tax. Examining the statute as a whole, in this Code section, the General Assembly uses the phrase "local governments" to refer to municipalities and counties (the bodies that are authorized to levy, assess, and collect an occupation tax). This suggests that when the General Assembly selected a different phrase, "local authority," in subpart 5 of that Code section, it was not referring to municipalities and counties but to some different category.

Similarly, throughout Chapter 13 of the Revenue and Taxation Code, which concerns "Specific, Business, and Occupation Taxes," the General Assembly uses the phrase "local government(s)" when a provision addresses the taxing authority of municipalities, counties, or both.[18] In this vein, we note that OCGA § 48-13-51, which concerns the permissible uses of revenue generated by an excise tax on hotel rooms and other accommodations, repeatedly refers to "a facility

---

[18] See, e.g., OCGA §§ 48-13-5 (4) (defining "[o]ccupation tax"); 48-13-7 (taxation of businesses and practitioners of professions and occupations with no location or office in Georgia); 48-13-9 (regulatory fees); 48-13-10 (criteria for classification of businesses and practitioners when calculating occupation tax); 48-13-11 (criteria which may not be used for classification of businesses and practitioners when calculating occupation tax); 48-13-14 (allocation of gross receipts for occupation tax purposes); 48-13-21 (collection of penalties and interest on delinquent occupation tax); 48-13-26 (executions for delinquent occupation tax); 48-13-50 (authority to levy an excise tax on hotel rooms and other accommodations).

owned or operated by a local government or local authority for convention and trade show purposes or any other similar or related purposes."[19] There would be no need to say "a local government *or* local authority" if the term "local authority" includes, as Atlanta contends, a municipality or other local government. Rather, use of the phrase shows that the General Assembly views a local government (that is, a county or municipality) and a local authority as distinct categories.[20]

In addition, although the General Assembly never defined a "local authority" in the Revenue and Taxation Code, it did define a "state authority" in that Code. In the Article providing for an excise tax on hotel rooms and other accommodations, "state authority" shall mean "an authority created by state law which serves a state-wide function, including, but not limited to, the Geo. L. Smith II Georgia World Congress Center Authority." OCGA § 48-13-50.2 (5). A "state authority" shall not mean, however,

> an authority created for support of a local government or a local purpose or function and shall not include authorities such as area planning and development commissions and any organizational entities they may create, regional commissions and any organizational entities they may create, or local water and sewer authorities.

Id. This suggests that a "local authority" means an agency created by one or more local governments to carry out certain discrete governmental functions for a local purpose.

Finally, although the General Assembly never defined a "local authority" in the Revenue and Taxation Code, it did define a "local authority" in Georgia's Local Government Code, as follows:

> [T]he term "local authority" means an instrumentality of one or more local governments created to fulfill a specialized public purpose or any other legally created organization that has authority to issue debt for a public purpose independent of a county or municipality, regardless of name; provided, however, that the term "local authority" does not include a state authority. A local authority may

---

[19] See, e.g., OCGA § 48-13-51 (a) (3), (a) (3.4), (a) (3.7), (a) (4), (a) (5) (A) (i).

[20] See also OCGA §§ 48-8-14 (a) (noting that the term "state agency" does not include a county, a municipality, or a local or regional governmental authority); 48-8-111 (a) (1) (D) (distinguishing among the county, municipalities within a special tax district, and local authorities within the district, for purposes of a county special purpose local option sales tax).

have been created by local constitutional amendment, general statute, or local law.

OCGA § 36-80-17 (contracts for utility services provided by a local utility authority).

Having considered all of the foregoing, we conclude that, in enacting OCGA § 48-13-13, the General Assembly did not intend the term "local authority" in subpart (5) to refer to a local government corporation, that is, a municipality or a county, but only to a local authority in the narrower sense discussed above. OCGA § 48-13-13 (5), therefore, does not prohibit one municipality from levying, assessing, and collecting an occupation tax from another municipality that conducts proprietary (non-governmental) revenue-generating activities within the geographical corporate limits of the first municipality.[21] Consequently, the trial court erred in granting partial summary judgment in favor of Atlanta on Count 3 of College Park's counterclaim and in denying College Park's motion for partial summary judgment on this issue.[22]

3. Atlanta contends that there was no dispute regarding whether only College Park is authorized to impose and collect taxes on the sale, storage, and distribution of alcoholic beverages at the airport within its city limits. Atlanta contends that the trial court therefore issued an impermissible advisory opinion when it granted College Park's request for a declaratory judgment to that effect. We agree.

To support a petition for a declaratory judgment,

> [t]he plaintiff must show facts or circumstances whereby it is in a position of uncertainty or insecurity because of a dispute and of having to take some future action which is properly incident to its alleged right, and which future action without direction from the court might reasonably jeopardize its interest. A declaratory judgment may not be granted in the absence of a justiciable controversy.

(Citations and punctuation omitted.) *Chattahoochee Bancorp v. Roberts*, 203 Ga. App. 405, 406 (416 SE2d 875) (1992). See also OCGA § 9-4-2 (a) (authorizing the superior courts "[i]n cases of actual controversy . . . to declare rights and other legal relations of

---

[21] See *Wright v. Fulton County*, 169 Ga. 354, 364 (4) (150 SE 262) (1929) (Fulton County was subject to an occupation tax imposed by the State for the county's proprietary operation of selling motor fuels.).

[22] We note that the issue of whether any other exemption may apply to any of Atlanta's specific proprietary activities has not yet been considered by the trial court and, therefore, is not ripe for appellate review.

any interested party petitioning for such declaration'').

> It is well settled that, for a controversy to justify the making of a declaration, it must include a right claimed by one party and denied by the other, and not merely a question as to the abstract meaning or validity of a statute. There can be no justiciable controversy unless there are interested parties asserting adverse claims upon a state of facts which have accrued.

(Citation, punctuation and footnote omitted.) *East Beach Properties v. Taylor*, 250 Ga. App. 798, 802 (552 SE2d 103) (2001). ''Where the party seeking declaratory judgment does not show it is in a position of uncertainty as to an alleged right, the dismissal of a declaratory judgment is proper to avoid issuance of an advisory opinion.'' (Citation and punctuation omitted.) *U. S. A. Gas v. Whitfield County*, 298 Ga. App. 851, 853-854 (1) (681 SE2d 658) (2009).

In responding to College Park's motion for partial summary judgment on this issue, Atlanta conceded that, under Georgia's Alcoholic Beverages Code, only College Park is authorized to impose and collect taxes on the sale, storage, and distribution of alcoholic beverages at the airport within its city limits.[23] Pretermitting whether College Park showed that, on one or more occasions, a taxpayer that owed alcoholic beverage taxes to College Park may have mistakenly paid the taxes to Atlanta, College Park failed to show that *it* was in a position of uncertainty or insecurity regarding its authority to impose and collect such taxes. Similarly, pretermitting whether College Park has authority, whether by assignment or otherwise, to seek any refund on behalf of taxpayers who are not parties to this litigation, Atlanta conceded that it must refund any alcoholic beverage taxes that it received in error for the sale, storage, and distribution of alcohol in portions of the airport located within the corporate boundaries of College Park. Accordingly, College Park failed to show that there was any justiciable controversy on this issue. The trial court's ruling on these issues was advisory, therefore, and we vacate the declaratory judgment in College Park's favor on

---

[23] OCGA § 3-8-1 (e) provides:

The county or municipality authorized by law to impose and collect taxes on the sale, storage, and distribution of alcoholic beverages at the airport may impose and collect such taxes, unaffected by this Code section; and the county or municipality owning or operating, or both, the airport shall not impose or collect such taxes. The proceeds of the taxes which the county and the municipality are authorized by law to impose and collect on the sale, storage, and distribution of alcoholic beverages at the airport shall be equally divided between the county and the municipality.

Count 6 of its counterclaim. *Effingham County Bd. of Commrs. v. Effingham County Indus. Dev. Auth.*, 286 Ga. App. 748, 750-751 (650 SE2d 274) (2007). Upon remand, the trial court shall enter judgment dismissing this claim. Id.

*Judgments affirmed in part, reversed in part, and vacated in part, and case remanded. Andrews and Doyle, JJ., concur.*

DECIDED JUNE 23, 2011 —
RECONSIDERATION DENIED JULY 18, 2011 —

*Michael S. Fineman, Hunton & Williams, Matthew J. Calvert, Cherie A. Phears*, for appellant.

*Fincher, Denmark & Williams, Steven M. Fincher, Winston A. Denmark, Michael J. Williams, Emilia C. Walker, L'Erin F. Barnes*, for appellee.