**Jessica PARM, on behalf of herself and all others similarly situated, Plaintiff,**

v.

**NATIONAL BANK OF CALIFORNIA, N.A., Defendant.**

**CIVIL ACTION FILE NO.: 4:14–CV–0320–HLM**

United States District Court, N.D. Georgia, Rome Division.

Signed 03/06/2017

Darren T. Kaplan, Darren Kaplan Law Firm, P.C., Atlanta, GA, Hassan A. Zavar-

eei, Jeffrey D. Kaliel, Tycko & Zavareei, LLP, Washington, DC, John Austin Moore, Norman E. Siegel, Stephen N. Six, Stueve Siegel Hanson, LLP, Kansas City, MO, for Plaintiff.

Anand S. Raman, Geoffrey M. Wyatt, Jessica D. Miller, John H. Beisner, Skadden Arps Slate Meagher & Flom LLP, Washington, DC, John F. Friedemann, Kyle M. Fisher, Friedemann Goldberg, LLP, Santa Rosa, CA, Stuart H. Singer, Boies, Schiller & Flexner, LLP, Ft. Lauderdale, FL, Craig G. Kunkes, Richard Lance Robbins, Robbins Ross Alloy Belinfante Littlefield, LLC, John Phillip MacNaughton, Ross A. Albert, Morris Manning & Martin, LLP, Atlanta, GA, for Defendant.

## ORDER

Harold Lloyd Murphy, UNITED STATES DISTRICT JUDGE

This case is before the Court on Defendant's Motion for Judgment on the Pleadings [68], on Defendant's Motion to Dismiss for Failure to State a Claim ("Motion to Dismiss") [82], and on Defendant's Motion for Order Setting Status Conference [86].[1]

## I. Background

### A. Procedural Background

The Court incorporates the procedural background portion of its May 20, 2015,

Order into this Order as if set forth fully herein, and adds only those procedural background facts that are relevant to the instant Order. (Order of May 20, 2015 (Docket Entry No. 46) at 1–2.) On May 20, 2015, the Court denied Defendant's Motion to Compel Arbitration, and granted in part and denied in part Defendant's Motion to Dismiss, dismissing Plaintiff's claims under the Racketeer Influenced Corrupt Organization Act ("RICO") without prejudice. (See generally id.) Defendant appealed from the denial of the Motion to Compel Arbitration. (Notice of Appeal (Docket Entry No. 47).) At the Parties' request, the Court stayed the case pending resolution of the appeal. (Consent Mot. Stay (Docket Entry No. 48); Order of June 4, 2015 (Docket Entry No. 51).)

On August 29, 2016, the United States Court of Appeals for the Eleventh Circuit affirmed the Court's denial of the Motion to Compel Arbitration. (Eleventh Circuit Opinion (Docket Entry No. 57).) On September 27, 2016, the Eleventh Circuit issued its mandate. (Mandate (Docket Entry No. 58).)

On October 11, 2016, Defendant filed its Answer. (Answer (Docket Entry No. 63).) On November 8, 2016, Defendant filed its Motion for Judgment on the Pleadings. (Mot. J. Pleadings (Docket Entry No. 68).) The briefing process for the Motion for Judgment on the Pleadings is complete, and the Court finds that the matter is ripe for resolution.[2]

On December 13, 2016, the Court granted a consent Motion filed by the Parties

---

1. Because this Order resolves this action, the Court denies as moot Defendant's Motion for Order Setting Status Conference. The Court also denies as moot Defendant's Requests for Judicial Notice.

2. The Court would have preferred to deny Defendant's Motion for Judgment on the Pleadings without prejudice and to have De-

fendant address all of its arguments in one single Motion to Dismiss, rather than having Defendant's Motion for Judgment on the Pleadings apply to the later-filed First Amended Complaint. The Court, however, recognizes that the Parties and their counsel worked hard to reach an agreement concerning the First Amended Complaint, the Motion for Judgment on the Pleadings, and the Motion to

and permitted Plaintiff to file a First Amended Complaint. (Order of Dec. 13, 2016 (Docket Entry No. 79).) On December 14, 2016, Plaintiff filed her First Amended Complaint. (First Am. Compl. (Docket Entry No. 80).)

On January 13, 2017, Defendant filed its Motion to Dismiss. (Mot. Dismiss (Docket Entry No. 82).) The time period in which Plaintiff could respond to the Motion to Dismiss, as agreed by the Parties, expired without Plaintiff filing a response. (See Order of Dec. 13, 2016, at 2 ("[Defendant] shall file its motion to dismiss Claim 1 and Claim 2 of the First Amended Class Action Complaint within thirty (30) days of the filing of the First Amended Class Action Complaint; [Plaintiff] shall file her response within twenty one (21) days of [Defendant's] motion to dismiss; and [Defendant] shall file its reply within fourteen (14) days of [Plaintiff's] response.").) On February 9, 2017, the Court entered an Order directing Plaintiff to file her response by no later than February 13, 2017. (Order of Feb. 9, 2017 (Docket Entry No. 83).) Plaintiff filed her response on February 13, 2017. (Resp. Mot. Dismiss (Docket Entry No. 84).) Defendant filed a reply in support of its Motion, (Reply Supp. Mot. Dismiss (Docket Entry No. 87).) The Court finds that the briefing process for the Motion to Dismiss is complete, and concludes that the matter is ripe for resolution.

### B. Plaintiff's Allegations

#### 1. The Parties

Plaintiff resides in LaFayette, Georgia. (First Am. Compl. (Docket Entry No. 80) ¶ 14.) Defendant is a national banking association incorporated and with its main offices located in the State of California, (Id. ¶ 15.)

#### 2. Payday Lending and Western Sky's Business

Plaintiff alleges that payday loans, which are small loans that become due in full on the borrower's next payday, "have a long and sordid history," and that "[p]ayday lenders operate on the shadowy fringe of the mainstream financial system." (First Am. Compl. ¶¶ 3, 40, 43.) According to Plaintiff, at least seventeen states have either directly banned payday loans or effectively banned payday loans by operation of an interest cap. (Id. ¶ 4.) Plaintiff points out that payday loans are illegal in Georgia and a number of other states, as well as the District of Columbia. (Id. ¶¶ 4, 46, 48.) Plaintiff alleges that certain payday lenders use the Internet to offer payday loans to borrowers who reside in states where payday loans are banned (the "Illegal Payday Lenders"), and the loans (the "Illegal Payday Loans") have exorbitant interest rates varying from 100 percent to 1500 percent. (Id. ¶¶ 5, 43, 48.)

Plaintiff asserts that "[p]ayday loans target the most vulnerable and desperate of borrowers." (First Am. Compl. ¶ 42.) Plaintiff alleges that payday lenders engage in deceptive practices to ensure that a borrower never pays off a loan, including "represent[ing] to borrowers that the total payment for satisfying the payday loan is the sum of the principal borrowed plus a one-time stated finance charge," while, in reality the lenders, "continuously debit purported 'finance' charges from borrowers," without applying the funds to the principal of the loan. (Id. ¶ 44.) Plaintiff also complains that, to ensure that the loans are not paid off, "payday lenders

Dismiss, and the Court will honor that agreement.

routinely 'roll over' the borrower's loan balance without first securing affirmative consent to do so," and "[o]ver 75 percent of payday loan volume is the result of 'churn,' " in which borrowers must take out additional loans to pay the original debt, resulting in borrowers frequently being "charged . substantially higher interest rates than the terms stated in the agreement." (Id. ¶ 45.)

According to Plaintiff, the Illegal Payday Lenders' loan agreements with borrowers often include authorizations that allow the Illegal Payday Lenders to "initiate" Automated Clearing House ("ACH") transactions on behalf of the borrowers. (First Am. Compl. ¶¶ 6, 40.) Notably, the authorization to initiate only . permits a lender to make a request to an ACH Network member bank to be allowed entry to the ACH Network. (Id. ¶¶ 6, 53.) A lender cannot initiate entry into the ACH Network on its own, and, to use that network, a "lender must find an ODFI bank that is [a] member of the ACH Network and willing to accept the lender's requests to 'initiate' credit and debit entries on the loan." (Id. ¶¶ 6, 40, 53.)

The ACH Network's rules and regulations require that an ACH Network member bank enter into a written agreement with merchants who seek to initiate credits and debits electronically. (First Am. Compl. ¶ 7.) According to Plaintiff, the "agreement describes in detail the scope of the relationship between the parties and has very specific requirements about what each party can and cannot do." (Id.)

Plaintiff alleges that, "[b]ecause the Illegal Payday Lenders cannot introduce credit and debit entries into the network on their own, [their] ability to defy the law of thirteen states rests on the cooperation of financial institutions like [Defendant]

that knowingly enter into these written contracts with Illegal Payday Lenders and then 'originate' debits and credits from borrowers' bank accounts on the ACH Network." (First Am. Compl. ¶ 8.) According to Plaintiff, those banks, called Originating Depository Financial Institutions ("ODFIs"), serve as the Illegal Payday Lenders' sole access point to the ACH Network. (Id.) Stated differently, without the small group of ODFIs who are willing to work with the Illegal Payday Lenders, the Illegal Payday Lenders' credit and debit entries could not enter the secure ACH Network. (Id.) According to Plaintiff, "it would be, impossible for Illegal Payday Lenters to deposit payday loan proceeds or debit payday loan payments from customers' bank accounts" in states where the loans are illegal and unenforceable "without [the ODFIs'] willingness to allow the Illegal Payday Lenders to access the ACH Network." (Id. ¶ 9.) Plaintiff alleges that Defendant, as an ODFI, participated actively in this scheme by granting the Illegal Payday Lenders' requests to initiate ACH entries for payday loan credits and debits to and from borrower checking accounts, and by knowingly taking affirmative steps to originate those entries into the ACH Network, thus enforcing debts that Defendant knew were unlawful. (Id. ¶ 10.)

According to Plaintiff, Western Sky Financial, LLC ("Western Sky") is a South Dakota limited liability company that offers payday loans to consumers over the internet. (First Am. Compl. ¶ 16.) The owner of Western Sky is a member of the Cheyenne River Sioux Indian Reservation. (Id. ¶ 17.) Plaintiff claims that CashCall, Inc. ("CashCall"), a California company, marketed high-cost, consumer-installment loans (the "WS Loans"), which were financed by CashCall's wholly owned subsid-

iary, WS Funding, (Id. ¶¶ 17–19, 23–24.) According to Plaintiff, the WS Loans were made in Western Sky's name and were quickly sold and assigned to WS Funding and serviced and collected by CashCall or an affiliated debt-collection company, Delbert Services Corporation, (Id. ¶¶ 18–21.) Plaintiff alleges that CashCall paid Western Sky the full amount of the loan disbursed to the borrower, plus a premium of approximately five percent, with a guaranteed minimum monthly payment of $110,000, and that, because CashCall was entitled to collect and keep the interest from the loans, debt collection and maintaining access to consumers' bank accounts was essential for CashCall's business model. (Id. ¶ 20.) According to Plaintiff, Western Sky "unlawfully conditioned the extension of credit on recurring preauthorized electronic fund ACH transfers," and "the entire scheme hinged on cooperation from financial institutions willing to allow Western Sky/CashCall direct access to consumers' bank accounts through the ACH Network." (Id. ¶ 26; see also id. ¶ 33 ("[T]he scheme would not have been possible without ODFI banks such as [Defendant] who were willing to participate in and profit from the illegal loans by providing Western Sky, CashCall and their affiliated entities access to the ACH Network to collect these unlawful debts.").)

Plaintiff notes that state and federal regulators began taking legal action against CashCall and Western Sky almost immediately after they began offering online loans. (First Am. Compl. ¶ 27.) According to Plaintiff, since 2009, at least twenty-four states, the Federal Trade Commission (the "FTC") and the Consumer Financial Protection Bureau (the "CFPB") have taken legal action against Western Sky, CashCall, or their affiliates for a number of offenses, including "unlaw-

fully making loans without proper state licensure and in violation of state usury laws, for consumer protection violations, misrepresentations, and/or for illegal debt collection practices." (Id.) Western Sky, CashCall, and their affiliates have entered into settlement agreements with the FTC and a number of states, and enforcement actions against those entities remain pending in Georgia and Florida. (Id. ¶ 28.) Plaintiff alleges that, because of those actions, "there is a vast public record going back years detailing the illegality of the payday loan scheme." (Id. ¶ 29.)

In September 2013, Western Sky announced that it was ceasing operations immediately. (First Am. Compl. ¶ 30.) According to Plaintiff, Western Sky, CashCall, and their affiliates still continued "to attempt to collect on hundreds of thousands of outstanding loans by debiting consumers' bank accounts for millions of dollars." (Id.) Plaintiff alleges that "Western Sky, CashCall and their affiliated entities engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright." (Id. ¶ 34.) According to Plaintiff, "Western Sky, CashCall and their affiliated entities are in the business of making and collecting 'unlawful debts' under 18 U.S.C. § 1961(6)," because the loans are "unenforceable because of state or federal laws against usury," "incurred in connection with the business of lending money at an usurious rate," and "the usurious rate was at least twice the enforceable rate." (Id.)

### 3. The ACH Network

"The ACH Network is a processing system in which financial institutes accumulate ACH transactions throughout the day for later batch processing." (First Am.

Compl. ¶ 49.) "ACH Network transactions are transmitted electronically," instead of via paper, (Id.) NACHA, formerly known as the National Automated Clearing House Association, and the Federal Reserve establish the rules and regulations governing the ACH, and "NACHA manages the development, administration, and governance of the ACH Network." (Id. ¶ 50.)

Plaintiff states that NACHA sets forth Operating Rules and Operating Guidelines for ACH Network participants that govern the use of the ACH Network. (First Am. Compl. ¶ 51.) An ACH transaction occurs in multiple steps, and the NACHA rules permit rejection of entries at any point if they fail to comply with the NACHA Rules or if they are illegal under federal state law. (Id. ¶ 52.)

According to Plaintiff, the first step of an ACH transaction involves having a merchant, or Originator, receive authorization from a party, referred to as the "Receiver," to initiate credits or debits from the Receiver's bank account via the ACH Network, and this authorization is generally "styled as an 'Authorization to Initiate ACH Transactions.'" (First Am. Compl. ¶ 52.) After obtaining this authorization, the merchant may take the next step in the process, which requires finding an ODFI bank that participates in the ACH Network and that is willing to enter into a separate written contract with the merchant to originate the merchant's request to initiate credit or debit entries into the network, (Id.)

Plaintiff notes that the NACHA rules prohibit Originators from introducing debit entries into the ACH Network on their own. (First Am. Compl. ¶ 53.) Instead, Originators must make a request to initiate a debit entry via "the specific ACH member ODFI bank or banks with which they have entered into a contractual relationship to grant them access to the ACH Network." (Id.) Plaintiff alleges that the ODFI banks, as gatekeepers, must "fully audit and vet the Originator's business to ensure it complies with NACHA Rules[ ] and state and federal laws before entering into a contractual arrangement with that Originator." (Id.)

Once the ODFI is satisfied with the Originator's compliance, the ODFI may, under its agreement with the Originator, transmit the ACH debit or credit to a pass-through clearing house, known as an ACH Operator. (First Am. Compl. ¶ 54.) The ACH Operator processes entries between the ODFI and the Receiver's bank, known as the Receiving Depository Financial Institution (the "RDFI"), which also is a member of the ACH Network. (Id.) The RDFI is the entity that actually makes the credit or debit to the Receiver's checking or savings account. (Id.)

The ACH Network also has "Third Party Service Providers," or entities other than the Originator, ODFI, or RDFI that perform functions on behalf of the Originator. (First Am. Compl. ¶ 55.) "A Third–Party Sender is a type of Third Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third–Party Sender and not the Originator." (Id. (internal quotation marks omitted).) According to Plaintiff, an ODFI has the same obligations regardless of whether it originates directly for an Originator or for a Third–Party Sender acting on the Originator's behalf. (Id.)

Plaintiff claims that the NACHA rules require parties involved in ACH transactions to follow all state and federal laws in order to "to keep illicit and unlawful transactions out of the ACH Network." (First

Am. Compl. ¶ 56.) Plaintiff also alleges that all ACH Network participants are required to conduct risk-based due diligence and monitoring for unlawful transactions, and the NACHA board urges all participant to implement adequate control systems to detect and prevent fraud and abusive financial transactions. (Id. ¶ 57.) According to Plaintiff, NACHA holds ODFIs responsible for compliance with NACHA rules by merchants and other third parties making requests for transactions; ODFIs act as the gatekeepers for the ACH Network. (Id. ¶¶ 58–59.) An ODFI must have an Origination Agreement for each Originator for which it originates entries on the ACH Network, or it must have an arrangement with a Third–Party Sender that has such an Origination Agreement. (Id. ¶ 59.) Plaintiff alleges that the NACHA rules require that an ODFI is responsible for all entities originated through the ODFI, and provide that the ODFI is responsible for its Originators' and Third–Party Senders' compliance with the NACHA rules. (Id. ¶ 60.) Plaintiff further alleges that, under the NACHA rules, an ODFI must conduct a risk assessment of its ACH activities and also must know its customers. (Id. ¶¶ 61, 66.) According to Plaintiff, under those rules, when an ODFI transmits an ACH entry, it warrants to each RDFI and to the ACH Operator that the entity has been properly authorized by the Originator and the Receiver. (Id. ¶ 63.) Plaintiff alleges that, for debit entries from consumer accounts, an authorization that is otherwise invalid under applicable law does not satisfy the NACHA rules' requirements of an authorization. (Id. ¶ 64.) According to Plaintiff, the NACHA rules require ODFIs to enter into written agreements with Third–Party Senders or Originators, which must include an agreement not to originate entries that violate the

law, which must restrict the types of entries that may be originated, and which must include a provision allowing the ODFI to audit the Originator's or Third–Party Sender's compliance with the Origination Agreement and the NACHA rules. (Id. ¶ 65.)

Plaintiff also claims that NACHA has warned ODFIs about the risks of working with payday lenders, and has reiterated that ODFIs have important policing duties and should exercise risk-based diligence when bringing on new Originators and Third–Party Senders, as well as engage in appropriate monitoring. (First Am. Compl. ¶¶ 67–70.) According to Plaintiff, in August 2013, NACHA warned banks "that authorizing access to customer accounts for Illegal Payday Lenders or their Third–Party Senders could violate NACHA rules," and stated that, under the NACHA rules, " 'purported authorizations to pay illegal loans that are unenforceable under applicable state law' are not valid." (Id. ¶ 70.)

Each entry onto the ACH Network bears an entry code identifying the type of activity that the entry represents. (First Am. Compl. ¶ 71.) Plaintiff alleges that NACHA identified two high-risk entry codes—ACH WEB and ACH TEL—for entries into the ACH Network that are often used by payday lenders. (Id.) A debit entry to a consumer account originated based on an authorization communicated other than orally to the Originator from the Receiver via the Internet is coded as a "WEB" entry. (Id. ¶ 72.) NACHA requires that, when requesting a WEB entry, an ODFI warrant that it has implemented fraud detection systems, verified the identity of the receiver, and verified the routing number. (Id. ¶¶ 73–74.) NACHA also recommends that an ODFI that transmits a WEB entry on behalf of an Originator

modify its Origination Agreement to address the allocation of liability between the Originator and the ODFI for WEB transactions, as well as any specific processing obligations relating to such transactions. (Id. ¶ 75.) Again, an ODFI that chooses to transmit a WEB entry on behalf of an Originator makes certain warranties, including that the Originator has employed a reasonable fraudulent transaction detection system to screen the entries, has employed reasonable methods of authentication to verify the Receiver's identity, has taken reasonable steps to verify that the routing numbers are valid, and has conducted an annual security audit. (Id.) Plaintiff alleges that an ODFI must know its Originators and must monitor WEB entries. (Id.)

Plaintiff also alleges that the Office of the Comptroller of the Currency (the "OCC") supervises national banks such as Defendant. (First Am. Compl. ¶ 76.) According to Plaintiff, on September 1, 2006, the OCC provided guidance for national banks and examiners concerning managing the risks of ACH activity, which indicated that those risks might include legal liability or damage to an institution's reputation when Originators or Third–Party Senders facilitated or engaged in activities that violated criminal laws. (Id. ¶¶ 77–79.) On April 24, 2008, the OCC provided guidance for national banks and examiners concerning managing the risks of ACH activity initiated by Third–Party Processors. (Id. ¶ 80.) This guidance cautioned that banks should have appropriate controls in place, including a due diligence and underwriting policy that required an initial background check and involved verifying the legitimacy of a processor's business operations, to avoid being viewed as facilitating fraud or unlawful activity. (Id. ¶¶ 80–82.)

Plaintiff further alleges that the Federal Deposit Insurance Corporation (the "FDIC"), which regulates state-chartered banks, issued guidance concerning payday lending on February 25, 2005, warning that such lending creates significant risks for banks, especially when the payday lenders initiate through Third–Party Senders. (First Am. Compl. ¶¶ 86–87.[3]) On June 6, 2008, the FDIC issued a "Guidance for Managing Third–Party Risk." (Id. ¶¶ 88–89.) Further, the FDIC advised banks to use "Due Diligence in Selecting a Third Party." (Id. ¶ 90.) On January 31, 2012, the FDIC issued revised guidance relating to "potential risks associated with relationships with third-party entities that process[ed] payments for telemarketers, online businesses, and other merchants," which may have a higher risk profile. (Id. ¶¶ 91–93.) According to Plaintiff, on February 15, 2013, the Regional Director for the FDIC's Chicago Regional Office wrote a letter to an Ohio-chartered bank stating, in relevant part, "we have generally found that activities related to payday lending are unacceptable for an insured depository institution." (Id. ¶ 94.)

### 4. Defendant's Business

Plaintiff pleads that, when Defendant originated entries on the ACH Network for illegal payday lenders, Defendant knew the identity of the lenders, knew the lenders were making payday loans, and knew the lenders were doing so in states that banned payday lending. (First Am. Compl. ¶¶ 11–12, 95.) Plaintiff claims that NA-

---

**3.** Paragraphs 83 through 85 are missing from the First Amended Complaint. (First Am. Compl. at 31.)

CHA's figures indicate that 99 percent of financial institutions on the ACH Network have never originated entries at the request of unlicensed online payday lenders. (Id. ¶ 96.) Plaintiff alleges that Defendant, in contrast, was one of the most active originators of ACH WEB and ACH TEL entries. (Id. ¶ 97.) Plaintiff claims that Defendant originated those entries because it could, and did, charge payday lenders higher fees, and that Defendant charged higher fees for the entries because it knew the transactions were illegal. (Id.) According to Plaintiff, those higher origination fees reflected a calculated risk that Defendant knowingly took to assist payday leaders in violating state laws, the NACHA rules, and the OCC and FDIC guidelines. (Id. ¶ 98.) In contrast, Plaintiff claims that the "overwhelming majority of ODFIs" would not originate entries for these same payday lenders. (Id.) According to Plaintiff, without the cooperation of an ODFI, lenders would have much greater difficulty collecting on payday loans because borrowers would have to take affirmative steps to pay such as writing and mailing a check. (Id. ¶ 99.)

Plaintiff alleges that characteristics of the payday lending transactions notified ODFIs of illegal activity. (First Am. Compl. ¶ 100.) According to Plaintiff, the ACH transactions for payday lenders raised several "red flags" indicating that potential unlawful activity was occurring. (Id. ¶ 101.) Plaintiff states that one red flag was the high return rates for the transactions, as the debit transactions were often returned because the account had insufficient funds or the account holder claimed the debit was not authorized. (Id. ¶ 102; see also id. ¶ 103 (noting that ACH debits originated via requests from payday lenders "far exceed the return rate for all electronic payments of less than 1%").) Plaintiff also claims that Defendant ignored the higher return rate for these transactions because it already knew the business of the Illegal Payday Lenders through its required due diligence obligations and because it could charge fees on returned payments, (Id. ¶ 103.) According to Plaintiff, the Financial Crimes Network of the U.S. Department of the Treasury had advised the banking industry that high numbers of returns or chargebacks for an originating merchant suggested that the originating merchant might be engaged in unfair or deceptive trade practices or fraud. (Id. ¶ 104.) Plaintiff alleges that Defendant "knowingly ignored the nature of the Illegal Payday Lenders' business, ignored their usage of entry codes that are known to be used by high risk Originators such as Illegal Payday Lenders ..., and ignored excessively high-return rates and charge backs in order to turn extra profit." (Id. ¶ 105.)

### 5. Plaintiff's Loan

On April 18, 2013, Plaintiff received a payday loan from Western Sky in the amount of $1,000.00. (First Am. Compl. ¶ 106.) The loan carried a finance charge of $3,831.06. (Id.) The scheduled payments totaled $4,831.06, resulting in an annual percentage rate of 233.71 percent. (Id.) According to Plaintiff, she "was required to provide an ACH Authorization for her checking account in order to obtain the loan." (Id.)

Plaintiff alleges that, on or about May 3, 2013, Western Sky or CashCall initiated a debit transaction of $74.50, through the ACH Network, from Plaintiff's Georgia checking account, which was applied only to the interest on the loan and did not reduce the amount of her debt. (First Am. Compl. ¶ 107.) Plaintiff claims that Defendant was the ODFI originating this trans-

action. (Id.) Plaintiff further states that on or about June 3, 2013, Western Sky or CashCall initiated an ACH Network debit of $198.19 from Plaintiff's checking account. (Id. ¶ 108.) From that payment, $186.25 went toward the interest on the loan, and only $11.94 went toward paying the principal. (Id.) Defendant was the ODFI originating the transaction. (Id.) Plaintiff alleges that Defendant received fees for originating these debit entries on the ACH Network for Western Sky or CashCall. (Id. ¶ 109.)

### 6. Plaintiff's Claims

Plaintiff asserts a number of claims, including: (1) a RICO claim based on a violation of 18 U.S.C. § 1962(c) (First Am. Compl. ¶¶ 117–33); (2) a RICO conspiracy claim based on a violation of 18 U.S.C. § 1962(d) (id. ¶¶ 134–38); (3) an unjust enrichment claim (id. ¶¶ 139–47); and (4) a claim for aiding and abetting violations of the Georgia Payday Lending Act (id. ¶¶ 148–59).

## II. Motion for Judgment on the Pleadings

### A. Applicable Standard

■ Rule 12(c) of the Federal Rules of Civil Procedure provides for motions for judgment on the pleadings. Fed. R. Civ. P. 12(c). "Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." Perez v. Wells Fargo, N.A., 774 F.3d 1329, 1335 (11th Cir. 2014) (internal quotation marks and citation omitted). When considering a motion for judgment on the pleadings, the Court accepts "as true all allegations in the complaint and construe[s] them in the light most favorable to the nonmoving party." In re Northlake Foods,

Inc., 715 F.3d 1251, 1255 (11th Cir. 2013). "If a comparison of the averments in the competing pleadings reveals a material dispute of fact, judgment on the pleadings must be denied." Perez, 774 F.3d at 1335.

### B. Discussion

#### 1. Unjust Enrichment Claim

■ Defendant argues that it is entitled to judgment on the pleadings with respect to Plaintiff's unjust enrichment claim, contending that Plaintiff has not conferred a benefit on Defendant. (Br. Supp. Mot. J. Pleadings (Docket Entry No. 68–1) at 21–24.) Plaintiff's unjust enrichment claim alleges that Defendant, in its role as an ODFI, originated debit entries on the ACH Network that were initiated by Illegal Payday Lenders or by Third–Party Senders acting on the originator's behalf, that violated state law, the NACHA Operating Rules, and the FDIC and OCC guidelines. (First Am. Compl. ¶ 140.) According to Plaintiff, Defendant "charged and retained a transaction fee for each debit entry it originated on the ACH Network initiated by Illegal Payday Lenders (or Third–Party Senders acting on the Originator's behalf) that were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines." (Id. ¶ 141.) Plaintiff alleges that Defendant "received and retained wrongful benefits from Plaintiff ... in the form of such transaction fees." (Id. ¶ 142.) Plaintiff contends that, as a result of Defendant's wrongful conduct, Defendant has been unjustly enriched at Plaintiff's expense and detriment, (Id. ¶ 143.) According to Plaintiff, Defendant's "unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged" in the Complaint. (Id. ¶ 144.) Plaintiff alleges that it is inequitable for Defendant to retain the

benefits that it received from originating debit entries on the ACH Network initiated by Illegal Payday Lenders or Third-Party Senders acting on behalf of the Originators, and that Defendant's "retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment." (Id. ¶ 145.) According to Plaintiff:

> The financial benefits derived by [Defendant] rightfully belong to Plaintiff .... [Defendant] should be compelled to disgorge in a common fund for the benefit of Plaintiff ... all wrongful or inequitable proceeds received .... A constructive trust should be imposed upon all wrongful or inequitable sums received by [Defendant] traceable to Plaintiff ....

(Id. ¶ 146.) Plaintiff alleges that she lacks an adequate remedy at law. (Id. ¶ 147.)

 A plaintiff asserting an unjust enrichment claim under Georgia law must establish that: "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying for it." Jenkins v. BAC Home Loan Servicing, LP, 822 F.Supp.2d 1369, 1377 (M.D. Ga. 2011). Some courts have required that a plaintiff confer a benefit directly to the defendant. See Tiller v. State Farm Mut. Auto Ins. Co., 549 Fed. Appx. 849, 856 (11th Cir. 2013) ("[W]e infer from some state court of appeals decisions that a transfer of some benefit

from plaintiff to defendant is an element of an unjust enrichment claim."); Bolinger v. First Multiple Listing Serv., Inc., Civil Action No. 2:10-CV-211-RWS, 2014 WL 4803155, at *9 (N.D. Ga. Sept. 26, 2014) ("[T]o state a claim for unjust enrichment, a plaintiff must allege that the defendants 'have received money belonging to the plaintiff or to which [the plaintiff] is in equity and good conscience entitled.'" (second alteration in original) (quoting Haugabook v. Crisler, 297 Ga.App. 428, 432, 677 S.E.2d 355, 359 (2009)); J'Carpc, LLC v. Wilkins, 545 F.Supp.2d 1330, 1341 (N.D. Ga. 2008) ("Plaintiff cannot claim unjust enrichment unless it can show that it conferred a benefit upon the defendant."); Brenner v. Future Graphics, LLC, 258 F.R.D. 561, 576 (N.D. Ga. 2007) (finding that the defendant was entitled to judgment as a matter of law on the plaintiffs' unjust enrichment claim where "[t]here is no evidence to establish that any of [the] named plaintiffs conferred a benefit directly to [the defendant]"); Smith Serv. Oil Co., Inc. v. Parker, 250 Ga.App. 270, 271, 549 S.E.2d 485, 487 (2001) ("Smith alleges damages to its business based on Parker's actions in refusing further [gasoline] deliveries, but there is no allegation that Smith has conferred a benefit on Parker for which it has not been compensated."); but see Terrill v. Electrolux Home Prods., Inc., 753 F.Supp.2d 1272, 1290 (S.D. Ga. 2010) ("Electrolux has not cited a Georgia authority restricting unjust enrichment claims to direct benefits, and the Court has not found any through its own research.").[4]

Here, Plaintiff presented nothing other than conclusory allegations to show that

---

4. Another United States District Judge in the Southern District of Georgia relied on Terrill to reject a defendant's "contention that, in order to state a claim for unjust enrichment, the benefits conferred must be direct bene-

fits." Chartis Ins. Co. of Can. v. Freeman, CV 111-193, 2013 WL 12121864, at *8 (S.D. Ga. Mar. 18, 2013). In that case, however, the plaintiff alleged that some of the money that its insured paid to one of the defendants for

she conferred a benefit on Defendant, whether directly or indirectly. Plaintiff simply alleges that Defendant originated entries on the ACH Network for payday lenders because it could charge the lenders fees for the transactions. Plaintiff fails to allege that any portion of the transaction fees came from her. As a result, Plaintiff's allegations fail to state an unjust enrichment claim against Defendant. See Tiller, 549 Fed.Appx. at 857 ("In this case, the plaintiffs have not conferred any sort of benefit on State Farm or performed any services for State Farm for which they have not been paid. Instead, their alleged injury is that State Farm underpaid a legal obligation that its insureds owed them. Assuming that is true, unjust enrichment is not the right avenue to recover the money."); J'Carpc, LLC, 545 F.Supp.2d at 1341 (finding that the plaintiff could not maintain an unjust enrichment claim where the plaintiff could not show that it conferred a benefit on the defendant); Smith Serv. Oil Co., Inc., 250 Ga.App. at 271, 549 S.E.2d at 487 (dismissing an unjust enrichment claim where the plaintiff failed to allege that it conferred a benefit on the defendant for which it had not been compensated).[5] The Court therefore grants

Defendant's Motion for Judgment on the Pleadings as to Plaintiff's unjust enrichment claim.

## 2. Payday Lending Act Claim

■ Defendant also moved for judgment on the pleadings as to Plaintiff's claim under the Georgia Payday Lending Act (the "Act"), arguing that the Act does not provide a civil remedy for aiding and abetting a violation of the Act. (Br. Supp. Mot. J. Pleadings at 7–21.) Plaintiff asserts a claim for aiding and abetting violations of the Act. (First Am. Compl. ¶¶ 148–59.) Plaintiff alleges that, under O.C.G.A. § 16–17–2, with certain limited exceptions, "it is unlawful to engage in any business which consists of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less." (Id. ¶ 149.) Plaintiff contends that the loan made to her "featured a principal amount of less than $3,000" and did not qualify for an exception under O.C.G.A. § 16–17–2. (Id. ¶ 150.) Plaintiff alleges that O.C.G.A. § 16–17–2(d) provides that any person who violates O.C.G.A. § 16–17–2(a) or (b) will be guilty of a misdemeanor, and that any person who aids or abets such a violation will be guilty of a misdemeanor of a high and

false invoices was later paid to the defendant that moved to dismiss the unjust enrichment claim for services that the moving defendant did not in fact provide, Id. The court therefore concluded that the plaintiff had alleged that its insured conferred a benefit on the moving defendant, in spite of the indirect nature of the benefit conferred. Id. Here, however, Plaintiff's Complaint does not allege that funds paid by Plaintiff were indirectly provided to Defendant. Plaintiff simply alleges that Defendant received transaction fees from the ACH transactions, not that the funds that Plaintiff paid went to Defendant. As such, Chartis Insurance Company is distinguishable from this case.

5. Plaintiff cites Dillon v. BMO Harris Bank, N.A., 16 F.Supp.3d 605 (M.D. N.C. 2014), in

support of her contention that she has sufficiently pleaded an unjust enrichment claim. In Dillon, the plaintiff, who resided in North Carolina, obtained loans from payday lenders, and sued the ODFIs in connection with the transactions related to those loans. 16 F.Supp.3d at 611. The United States District Court for the Middle District of North Carolina concluded that the plaintiff had stated an unjust enrichment claim. Id. at 622. Dillon is not overly helpful to the Court, however, as the Dillon court simply set forth the elements of an unjust enrichment claim under Georgia law and then summarily stated, "The Court concludes that Mr. Dillon has stated a claim for unjust enrichment," without providing further analysis. Id. In any event, Dillon is not binding on this Court.

aggravated nature. (Id. ¶ 151.) Plaintiff notes that O.C.G.A. § 16–17–3 permits a borrower or class of borrowers to bring a civil action under O.C.G.A. § 16–7–2. (Id. ¶ 152.)

Plaintiff alleges that Defendant "aided and abetted the Illegal Payday Lenders' violations of the [Act] by providing the necessary access to the ACH Network to carry out the Illegal Payday Lenders' illegal scheme." (First Am. Compl. ¶ 153.) Plaintiff contends that, in providing this access, Defendant "knowingly provided substantial assistance to—and profited from—the illegal lending activities of the Illegal Payday Lenders." (Id. ¶ 154.) Plaintiff further alleges that, when Defendant provided access to the ACH Network "to carry out the Illegal Payday Lenders' illegal scheme, it knew the identity of the Illegal Payday Lenders, including their unlawful activity." (Id. ¶ 155.) According to Plaintiff, NACHA rules prohibited Defendant "from honoring ACH transactions on unlawful payday loans." (Id. ¶ 156.) Plaintiff alleges that Defendant "was aware of the illegal nature of the lending activities of the Illegal Payday Lenders through due diligence procedures." (Id. ¶ 157.) Plaintiff states: "As a result of [Defendant's] knowing participation in the making of illegal payday loans, it is liable as an aider and abettor to the violations of the [Act] referenced herein." (Id. ¶ 159.)

O.C.G.A. § 16–17–2 makes certain "payday" loan transactions illegal, stating, in relevant part:

(a) It shall be unlawful for any person to engage in any business, in whatever form transacted, including, but not limited to, by mail, electronic means, the Internet, or telephonic means, which consists in whole or in part of making, offering, arrang-

ing, or acting as an agent in the making of loans of $3,000.00 or less unless:

(1) Such person is engaging in financial transactions permitted pursuant to:

(A) The laws regulating financial institutions as defined under Chapter 1 of Title 7, the "Financial Institutions Code of Georgia";

(B) The laws regulating state and federally chartered credit unions;

(C) Article 13 of Chapter 1 of Title 7, relating to Georgia residential mortgages;

(D) Chapter 3 of Title 7, the "Georgia Industrial Loan Act";

(E) Chapter 4 of Title 7, relating to interest and usury;

(F) Chapter 5 of Title 7, "The Credit Card and Credit Card Bank Act," including financial institutions and their assignees who are not operating in violation of said chapter; or

(G) Paragraph (2) of subsection (a) of Code Section 7–4–2 in which the simple interest rate is not greater than 16 percent per annum;

(2) Such loans are lawful under the terms of:

(A) Article 1 of Chapter 1 of Title 10, "The Retain Installment and Home Solicitation Sales Act";

(B) Article 2 of Chapter 1 of Title 10, the "Motor Vehicle Sales Finance Act"; or

(C) Part 5 of Article 3 of Chapter 12 of Title 44, relating to pawnbrokers;

(3) Subject to the provisions of paragraph (4) of subsection (b) of this Code section, such person is a bank or thrift chartered under the laws of the United States, a bank chartered under the laws of another state and insured by the Federal Deposit Insurance Corporation, or a credit card bank and is not operating in violation of the federal and state laws applicable to its charter; or

(4) Such loan is made as a tax refund anticipation loan. In order to be exempt under this paragraph the tax refund anticipation loan must be issued using a borrower's filed tax return and the loan cannot be for more than the amount of the borrower's anticipated tax refund. Tax returns that are prepared but not filed with the proper government agency will not qualify for a loan exemption under this paragraph.

(b) Subject to the exceptions in subsection (a) of this Code section, this Code section shall apply with respect to all transactions in which funds are advanced to be repaid at a later date, notwithstanding the fact that the transaction contains one or more other elements. Without limiting the generality of the foregoing, the advance of funds to be repaid at a later date shall be subject to this Code section, notwithstanding the fact that the transaction also involves:

(1) The cashing or deferred presentment of a check or other instrument;

(2) The selling or providing of an item, service, or commodity incidental to the advance of funds;

(3) Any other element introduced to disguise the true nature of the transaction as an extension of credit; or

(4) Any arrangement by which a de facto lender purports to act as the agent for an exempt entity. A purported agent shall be considered a de facto lender if the entire circumstances of the transaction show that the purported agent holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan.

O.C.G.A. § 16–17–2(a)-(b). O.C.G.A. § 16–17–2(d) sets forth criminal penalties for violating the Act, and provides:

Any person who violates subsection (a) or (b) of this Code section shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000 or both. Each loan transaction shall be deemed a separate violation of this Code section. Any person who aids or abets such a violation, including any arbiter or arbitration company, shall likewise be guilty of a misdemeanor of a high and aggravated nature and shall be punished as set forth in this subsection. If a person has been convicted of violations of subsection (a) or (b) of this Code section on three prior occasions, then all subsequent convictions shall be considered felonies punishable by a fine of $10,000.00 or five years' imprisonment or both.

O.C.G.A. § 16–17–2(d).

O.C.G.A. § 16–17–3, in turn, provides that a transaction that violates the Act will

be void, and that a violator will have liability to the borrower, stating:

> Any person who violates subsection (a) or (b) of Code Section 16–17–2 shall be barred from the collection of any indebtedness created by said loan transaction and said transaction shall be void ab initio, and any person violating the provisions of subsection (a) or (b) of Code Section 16–17–2 shall in addition be liable to the borrower in each unlawful transaction for three times the amount of any interest or other charges to the borrower. A civil action under Code Section 16–17–2 may be brought on behalf of an individual borrower or on behalf of an ascertainable class of borrowers. In a successful action to enforce the provisions of this chapter, a court shall award a borrower, or class of borrowers, costs including reasonable attorneys' fees.

O.C.G.A. § 16–17–3. Further, O.C.G.A. § 16–17–4 provides that a violator will be liable to the state:

> (a) Any person who violates subsection (a) or (b) of Code Section 16–17–2 shall be liable to the state for a civil penalty equal to three times the amount of any interest or charges to the borrowers in the unlawful transactions.
>
> (b) A civil action under Code Section 16–17–2 may be brought by the Attorney General, any district attorney, or a private party. Where a successful civil action is brought by a district attorney, one-half of the damages recovered on behalf of the state shall be distributed to the office of the district attorney of the judicial circuit of such district attorney to be used by the district attorney in order to fund the budget of that office.

O.C.G.A. § 16–17–4.

■ "[W]hether a statute creates by implication a private right of action is a question of statutory construction." Diamond Casino Cruise, LLC v. Dep't of Homeland Sec., 915 F.Supp.2d 1380, 1382 (S.D. Ga. 2013) (alteration in original) (internal quotation marks and citation omitted). When interpreting Georgia statutes, the Court " 'shall look diligently for the intention of the General Assembly.' " Chase v. Georgia, 285 Ga. 693, 695, 681 S.E.2d 116, 118 (2009) (quoting O.C.G.A. § 1–3–1 (a)). The Court shall apply " 'the ordinary signification . . . to all words.' " Id. (quoting O.C.G.A. § 1–3–1(b)). "Where the language of a statute is plain and susceptible to only one natural and reasonable construction, courts must construe the statute accordingly." Id. (footnote omitted) Indeed, "[w]here the language of a statute is plain and unambiguous, judicial construction is not only unnecessary but forbidden." Id. (alteration in original) (internal quotation marks and footnote omitted). "Moreover, Georgia law provides that the express mention of one thing in an act or statute implies the exclusion of all other things." Id. (footnote omitted). Thus, when reading a statute, the Court "is not authorized to disregard any of the words [used therein] unless the failure to do so would lead to an absurdity manifestly not intended by the legislature." Id. (emphasis and alteration in original) (internal quotation marks and footnote omitted); see also City of Atlanta v. City of College Park, 311 Ga.App. 62, 68–69, 715 S.E.2d 158, 164 (2011) ("[W]hen a statute is plain and susceptible of but one natural and reasonable construction, a court must simply follow the literal language of the statute, unless doing so would lead[ ] to absurd or wholly impracticable consequences[.]" (second and third alterations in original) (internal quotation marks and citation omitted)).

■ When interpreting statutes, "[a] court should consider one statute in the

context of other related statutes, reading all related statutes together so as to ascertain the legislative [intent] and give effect thereto." City of Atlanta, 311 Ga. App. at 70, 715 S.E.2d at 165 (second alteration in original) (internal quotation marks and citation omitted). "Similarly, in construing language in any one part of a statute, a court should consider the entire scheme of the statute and attempt to gather the legislative intent from the statute as a whole." Id. (internal quotation marks and citation omitted).

■■■ Further, when interpreting a Georgia statute, the Court "must presume that the General Assembly had full knowledge of the existing state of the law and enacted the statute with reference to it." Chase, 285 Ga. at 695, 681 S.E.2d at 118. The Georgia courts "construe statutes in connection and in harmony with the existing law, and as a part of a general and uniform system of jurisprudence, and their meaning and effect is to be determined in connection, not only with the common law and the constitution, but also with reference to other statutes and the decisions of the courts." Id. at 695–96, 681 S.E.2d at 118 (internal quotation marks and footnote omitted). Moreover, "forfeitures and penalties are not favored and statutes relating to them must be strictly construed, and in a manner as favorable to the person against whom the forfeiture or penalty would be exacted as is consistent with fair principles of interpretation." Anchor Motor Freight, Inc. v. Dep't of Transp., 199 Ga. App. 108, 109, 404 S.E.2d 148, 149 (1991) (internal quotation marks and citation omitted).

The Georgia Supreme Court has noted that "[t]he best indicator of the General Assembly's intent is the statutory text it actually adopted." Chase, 285 Ga. at 698,

681 S.E.2d at 120. Indeed, the Georgia Court of Appeals observed: "When we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant." Citibank (South Dakota), N.A. v. Graham, 315 Ga.App. 120, 121–22, 726 S.E.2d 617, 619 (2012) (internal quotation marks and citation omitted).

■■■ "[I]t is well settled that violating statutes and regulations does not automatically give rise to a civil cause of action by an individual claiming to have been injured from a violation thereof." Best Jewelry Mfg. Co., Inc. v. Reed Elsevier Inc., 334 Ga.App. 826, 833, 780 S.E.2d 689, 695–96 (2015) (internal quotation marks and citation omitted). "Rather, the statutory text must expressly provide a private cause of action." Id., 780 S.E.2d at 696 (internal quotation marks and citation omitted). The Georgia courts are generally reluctant to find that criminal statutes provide for private rights of action. See Jastram v. Williams, 276 Ga.App. 475, 476, 623 S.E.2d 686, 687 (2005) ("Criminal statutes, which express prohibitions rather than personal entitlements and specify a particular remedy other than civil litigation, are accordingly poor candidates for the imputation of private rights of action." (internal quotation marks and citation omitted)).

■■■ When determining whether a Georgia criminal statute gives rise to a private civil right of action, the Court must find any "indication that the legislature meant to impos[e] a civil as well as criminal penalty ... in the provisions of the statute at issue," rather than extrapolating it "from the public policy the statute generally appears to advance." Anthony v. Am. Gen. Fin. Serv., Inc., 287 Ga. 448, 455, 697 S.E.2d 166, 172 (2010) (first alteration

and emphasis in original) (internal quotation marks and citation omitted). Indeed, "the public policy advanced by a penal statute, no matter how strong, cannot support the implication of a private civil cause of action that is not based on the actual provisions of the relevant statute." Id. at 456, 697 S.E.2d at 172 (emphasis in original).

O.C.G.A. § 51–1–6 provides for a cause of action for violation of a duty. See O.C.G.A. § 51–1–6 ("When the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby."). This statute, however, "does not give rise to a private cause of action unless the statutes outlining the legal duty provide for a civil remedy." Northrup v. Conseco Fin. Corp., 141 F.Supp.2d 1372, 1376 (M.D. Ga. 2001); see also Jastram, 276 Ga.App. at 475, 623 S.E.2d at 687 (noting that O.C.G.A. § 51–1–6 "does not create a separate cause of action, but simply authorizes the recovery of damages for the breach of a legal duty otherwise arising, though not expressly stated, under a statute or common law"). The Georgia courts are reluctant to create private causes of action from statutes that do not expressly provide for such causes of action. The Georgia Court of Appeals concluded, when determining whether a breach of O.C.G.A. § 33–3–28 created a cause of action:

> The language of O.C.G.A. § 33–3–28 does not specifically create any cause of action for a breach thereof. While the legislature easily could have specifically created a cause of action for a breach of O.C.G.A. § 33–3–28 by its terms, it did

not choose to do so. This failure strongly indicates the legislature's intention that no such cause of action be created by said statute.

Parris v. State Farm Mut. Auto. Ins. Co., 229 Ga. App. 522, 524, 494 S.E.2d 244, 246 (1997); see also Best Jewelry Mfg. Co., Inc., 334 Ga.App. at 834, 780 S.E.2d at 696 ("None of the statutes or rules cited by plaintiff provides a private cause of action for damages arising from any violation of the respective statute or rule. It follows that plaintiff cannot maintain such a cause of action in this suit and that the trial court did not err when it dismissed this portion of the second amended complaint.").

Applying the above authority, the Court finds that the Act does not create a private right of action for aiding and abetting a violation of the Act. O.C.G.A. § 16–17–3 and O.C.G.A. § 16–17–4, which confer a private right of action, provide remedies against "a person who violates" and a "person violating" O.C.G.A. § 16–17–2(a) or (b). Those provisions do not refer to an aider and abettor. The General Assembly knew how to impose liability for aiding and abetting when it chose to do so, and if it had intended to do so here, presumably it would have used those words in the statutory text. See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 176–77, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (noting that "Congress knew how to impose aiding and abetting liability when it chose to do so," and stating that, if "Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not"). The fact that the General Assembly did not do so is a strong indication that the statutory scheme does not create a private

right of action against an aider and abettor.

Indeed, the Act as a whole demonstrates that the General Assembly knew how to reach aiders and abettors, as it imposed criminal liability against those individuals in O.C.G.A. § 16–17–2(d). The General Assembly also knew how to create a private right of action, as it created such a right of action against direct violators in O.C.G.A. §§ 16–17–3 and 16–17–4. When interpreting the Act, the Court must presume that the General Assembly's failure to expressly provide for a private right of action for damages against aiders and abettors, while providing such a right against primary violators, was a deliberate choice. The absence of such a provision supports a determination that the General Assembly did not intend to provide a private civil right of action for aiding and abetting violations of the Act.

The fact that O.C.G.A. § 16–17–2(d) imposes criminal liability on aiders and abettors does not warrant a different conclusion. As previously discussed, the Georgia Courts are extremely reluctant to impute private, civil rights of action from criminal statutes, and the Court sees no reason to depart from this rule.

The Court also declines to use the common law civil tort doctrine of aiding and abetting to extend civil liability to aiders and abettors under the Act. Nothing in the language of the Act indicates that it is intended to provide for aiding and abetting liability, and the Court will not put into the Act a provision that the "General Assembly left out of it and the Georgia courts

have not read into it." Chepstow Ltd. v. Hunt, 381 F.3d 1077, 1089 (11th Cir. 2004); see also id. at 1088–89 (finding that Georgia's Uniform Fraudulent Transfers Act did not provide for aiding and abetting liability).

Moreover, "it is worth noting that the General Assembly appears to be so concerned about the judicial creation of implied civil causes of action that it recently enacted O.C.G.A. § 9–2–8(a), which states that '[n]o private right of action shall arise from any Act enacted after the effective date of this Code section unless such right is expressly provided therein.'" Anthony, 287 Ga. at 459, 697 S.E.2d at 175 (quoting O.C.G.A. § 9–2–8(a)). Although O.C.G.A. § 9–2–8(a), which was enacted in 2010, would not apply to the pre-existing Act, "it certainly counsels against deviating from [the Georgia Supreme Court's] established precedent to find new implied civil causes of action." Id.

Plaintiff's arguments would require the Court to ignore the established rules of statutory construction and add terms to the statute that the General Assembly apparently never intended to include in the statutory scheme. The Court finds that reading a private civil right of action against aiders and abettors into the Act is inappropriate, and declines to do so here.

For the reasons discussed above, the Court finds that the Act does not provide a private civil right of action against aiders and abettors. The Court therefore grants Defendant's Motion for Judgment on the Pleadings as to Plaintiff's claim under the Act.[6]

---

**6.** Plaintiff relies on Chang v. JPMorgan Chase Bank, N.A., 841 F.3d 914 (11th Cir. 2016), vacated and superseded on rehearing by 845 F.3d 1087 (11th Cir. 2017), to support her

contention that she may pursue a claim against Defendant for aiding and abetting violations of the Act. In Chang, the United States Court of Appeals for the Eleventh Circuit con-

## III. Motion to Dismiss

### A. Standard Governing a Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) allows the Court to dismiss a complaint, or portions of a complaint, for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss, the Court must take the allegations of the complaint as true and must construe those allegations in the light most favorable to the plaintiff. Alvarez v. Attorney Gen. for Fla., 679 F.3d 1257, 1261 (11th Cir. 2012).

Although a court is required to accept well-pleaded facts as true when evaluating a motion to dismiss, it is not required to accept the plaintiff's legal conclusions. Chandler v. Sec'y of Fla. Dep't of Transp., 695 F.3d 1194, 1199 (11th Cir. 2012) (per curiam) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). The Court also does not accept as true "unwarranted deductions of fact[ ] or legal conclusions masquerading as facts." Snow v. DirecTV, Inc., 450 F.3d 1314, 1320 (11th Cir. 2006) (internal quotation marks and citation omitted).

Finally, the Court may dismiss a complaint if it does not plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Simpson v. Sanderson Farms, Inc., 744 F.3d 702, 708 (11th Cir. 2014) (internal quotation marks omitted) (quoting Iqbal, 556 U.S. at 678, 129 S.Ct. 1937). In Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the

Supreme Court observed that a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555, 127 S.Ct. 1955. Although factual allegations in a complaint need not be detailed, those allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. Moreover, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. The mere possibility that the defendant might have acted unlawfully is not sufficient to allow a claim to survive a motion to dismiss. Id. Instead, the well-pleaded allegations of the complaint must move the claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 570, 127 S.Ct. 1955.

When considering a motion to dismiss filed in a putative class action before certification of a class, the Court considers only Plaintiff's individual allegations relating to her loan, not the generalized allegations of the putative class members. Crissen v. Gupta, 994 F.Supp.2d 937, 945–46 (S.D. Ind. 2014). "Additionally, a named plaintiff must have a valid cause of action against each defendant, and cannot rely on the allegations of putative class members if he or she does not also have a claim against that defendant." Id. at 946.

### B. Discussion

Plaintiff brings two claims against Defendant under the RICO statute. Claim 1

---

cluded that a plaintiff had stated a claim for aiding and abetting fraud. 845 F.3d at 1098–99. Chang is distinguishable from this action, as it involved Florida law, and the Florida courts had assumed that a cause of action for aiding and abetting fraud existed. Id. Further, Chang did not require the Eleventh Circuit to determine whether a criminal statute might give rise to a private cause of action for aiding and abetting liability.

of Plaintiff's First Amended Complaint alleges that Defendant participated in a scheme to collect unlawful debts in violation of 18 U.S.C. § 1962(c). (First Am. Compl. ¶¶ 117–133.) 18 U.S.C. § 1962(c) states:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Claim 2 of Plaintiff's First Amended Complaint alleges Defendant participated in a conspiracy to collect unlawful debts in violation of 18 U.S.C. § 1962(d). (First Am. Compl. ¶¶ 134–138.) That portion of the statute states: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). Defendant has moved to dismiss both of the RICO claims, and the Court discusses the claims in turn.

### 1. RICO Enterprise

■ To establish a RICO violation under 18 U.S.C. § 1962(c), Plaintiff must prove:

(1) the existence of an enterprise which affects interstate or foreign commerce, (2) that the defendant associated with the enterprise; (3) that the defendant participated in or conducted the enterprise's affairs; and (4) that the participation in or conduct of the enterprise's affairs was through a pattern of racketeering activities.

United States v. Goldin Indus., Inc., 219 F.3d 1271, 1274 (11th Cir. 2000); see also Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1348 (11th Cir. 2016) ("To recover [under § 1962(c)], a civil plaintiff must establish that a defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." (internal quotation marks and citation omitted)). The RICO statute defines an enterprise as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

Here, Defendant argues that Plaintiff has not pleaded either the existence of a RICO enterprise or that Defendant participated in the management or control of the enterprise. (Br. Supp. Mot. Dismiss (Docket Entry No. 82–1) at 1.) The Court addresses those arguments in turn.

#### a. Enterprise

■ Given the statutory definition of an enterprise, "a RICO enterprise can either be a legal entity or an association in fact." In re MasterCard Int'l Inc., Internet Gambling Litig., 132 F.Supp.2d 468, 484 (E.D. La. 2001) aff'd sub nom. In re MasterCard Int'l Inc., 313 F.3d 257 (5th Cir. 2002). "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

■ Here, Plaintiff alleges that the RICO enterprise is an association-in-fact. In the Eleventh Circuit, "a RICO enterprise need not possess an 'ascertainable structure' distinct from the associations necessary to conduct the pattern of racketeering activity." Goldin Indus., 219 F.3d at 1274–75 (quoting United States v. Wein-

stein, 762 F.2d 1522, 1537 n.13 (11th Cir. 1985) opinion modified on denial of reh'g, 778 F.2d 673 (11th Cir. 1985)). A RICO enterprise, however, must have some structure, and "[f]rom the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 556 U.S. 938, 946, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009). "To show there is an association-in-fact enterprise at the motion to dismiss phase, the Eleventh Circuit 'has never required anything other than a 'loose or informal' association of distinct entities.'" J & D Int'l Trading (Hong Kong) Ltd. v. MTD Equip., LLC, No. 1:13-CV-2526-RWS, 2014 WL 1683375, at *13 (N.D. Ga. Apr. 28, 2014) (some internal quotation marks omitted) (quoting Williams v. Mohawk Indus., 465 F.3d 1277, 1284 (11th Cir. 2006)). The Supreme Court has further held that "RICO both protects a legitimate enterprise from those who would use unlawful acts to victimize it, and also protects the public from those who would unlawfully use an enterprise (whether legitimate or illegitimate) as a vehicle through which unlawful ... activity is committed." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 164, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001) (internal quotation marks and citation omitted). Although the Supreme Court's definition is expansive in nature, "it is not limitless." United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co., 719 F.3d 849, 853 (7th Cir. 2013).

Here, Plaintiff alleges that Western Sky/CashCall is an Originator in the ACH Network, and must enter into an agreement with an ODFI, such as Defendant, to debit or credit consumers' bank accounts through the ACH Network. (First Am. Compl. ¶ 120.) Plaintiff contends that Defendant, as an ODFI, is a gatekeeper for the ACH Network and is responsible for the debit and credit entries it originates. (Id. ¶ 121.) Plaintiff alleges that Defendant and Western Sky/CashCall "associated together to use their respective roles in the ACH Network for the common purpose of profiting through the collection of unlawful debt" (id. ¶ 122), and that, to further this purpose, Western Sky/Cash Call initiated debit entries through the ACH Network (id. ¶ 123), while Defendant used its gatekeeping role to permit those entries to proceed through the ACH Network, "[d]espite knowing the unlawful nature of Western Sky/CashCall's business" (id. ¶ 124). Plaintiff asserts that Defendant: (1) "charged Western Sky/CashCall a fee for every ACH debit entry [Defendant] originated on behalf of Western Sky/CashCall" (id. ¶ 125); (2) "knew that Western Sky/Cash Call was engaged in the business of illegal online payday lending and knew that payday loans were illegal and unenforceable" in a number of states (id. ¶ 126); and (3) agreed to associate with Western Sky/Cash Call "for the purpose of using their respective roles in the ACH Network to profit through the collection of these unlawful debts" (id.). According to Plaintiff, the payments collected on the Western Sky/CashCall loans are unlawful debts under 18 U.S.C. § 1961(6). (Id. ¶ 127.) Plaintiff asserts that Defendant's association with Western Sky/CashCall is an association-in-fact enterprise and "has a defined structure that includes a common purpose, defined relationship among members, and sufficient longevity to achieve the purpose of the enterprise." (Id. ¶ 128.) Specifically, Plaintiff alleges that Defendant and West-

ern Sky/CashCall: (1) "share the common unlawful purpose of using their respective roles In the ACH Network to profit through the collection of unlawful debt" (id. ¶ 128a.); (2) "preserve a close business relationship and maintain established and defined roles within [the] enterprise" (id. ¶ 128b.); and (3) "associated together for a sufficient period to allow [Defendant] and Western Sky/CashCall to achieve their common purpose" (id. ¶ 128c.). Plaintiff contends that, without Defendant's participation as an ODFI, Western Sky/CashCall could not debit the bank accounts of the borrowers to collect unlawful debts, (Id. ¶ 130.) Further, Plaintiff alleges that Defendant "was aware that it was violating the NACHA Rules and FDIC and OCC guidelines," and that Defendant, "through its actions of originating debit entries initiated by Western Sky/CashCall, induced borrowers to repay unlawful debts incurred in the business of usurious lending and was aware that the unlawful debts it collected violated the laws of multiple states." (Id. ¶ 131.) Plaintiff states, in conclusory fashion, that Defendant "associated with the Unlawful Debt Collection Enterprise and participated in, conducted, and furthered the affairs of the enterprise through the collection of unlawful debts." (Id. ¶ 132 (footnote omitted).) Plaintiff alleges that she suffered injury from having funds debited from her bank account to pay the unlawful debt. (Id. ¶ 133.)

The decision of the United States District Court for the Western District of Wisconsin in Jubelirer v. MasterCard Int'l, Inc., 68 F.Supp.2d 1049 (W.D. Wisc. 1999), provided significant guidance to the Court when determining whether Plaintiff had alleged a viable § 1962(c) claim, (Order of May 20, 2015, at 112–20), and it continues to assist the Court in determining whether Plaintiff has alleged a viable § 1962(c)

claim. The plaintiff in Jubelirer gambled at an online casino and lost. 68 F.Supp.2d at 1051–52. The plaintiff used his bank-issued MasterCard to open his account and receive credits. Id. The plaintiff sued his bank and MasterCard under RICO for participating in the financing of his gambling. Id. The plaintiff alleged the existence of an "association in fact between the defendants and the Internet casinos." Id. at 1052.

Based on the following explanation of RICO, the Wisconsin district court dismissed the plaintiff's § 1962(c) claim because the complaint's allegations were "insuff[i]cient to support the existence of a RICO enterprise." Jubelirer, 68 F.Supp.2d at 1052. The court concluded that, in the relationship between the bank, MasterCard, and the internet casino, there was no " 'structure' for 'hierarchical or consensual decision making,' " but instead "nothing more than a simple contract for services of a type entered by millions of others." Id. The court based this decision on the fact that: Mastercard "offers these services for a fee to merchants throughout the world and more than 10 million merchants contract for them," "MasterCard also contracts with lenders such as [the bank defendant] to allow their customers to purchase goods and services from MasterCard associated merchants," and the bank "collects the debt incurred by its customers regardless of the authorized merchant from whom the customer purchased the goods or services, no doubt giving little thought to the ten million MasterCard merchant subscribers." Id. at 1052–53. The Jubelirer court noted that "[a]ccepting plaintiffs allegations as sufficient to allege a RICO enterprise would lead to the absurd conclusion that each of the many million combinations of merchant, MasterCard and

lender is a RICO enterprise," and stated that "[a]n enterprise must be more than a routine contractual combination for the provision of financial services." Id. at 1053.

Here, as in Jubelirer, the enterprise that Plaintiff alleges is, at most, a routine contractual combination to provide financial services. That type of enterprise is not generally sufficient to constitute a RICO enterprise under § 1962(c). For example, "[c]ourts have specifically held that where credit card companies are carrying out their business of processing transactions, they are not participating in a RICO enterprise." Chi v. MasterCard Int'l, Inc., No. 1:14-CV-614-TWT, 2014 WL 5019917, at *2 (N.D. Ga. Oct. 7, 2014). Similarly in this case, Defendant is carrying out its business of processing electronic transactions. As such, Plaintiff has failed to plausibly allege a RICO enterprise.

█ Plaintiff's non-conclusory allegations, at most, amount to Defendant acting as a bank processing electronic transactions or allowing access to the ACH network. Generally, "[t]he fact that a bank provided banking services ... is not enough to state a claim under § 1962(c)." Zhu v. First Atlantic Bank, No. 05 Civ. 96, 2005 WL 2757536, at *5 (S.D.N.Y. Oct. 25, 2005) (second alteration in original) (internal quotation marks omitted); see also Patel v. Fendler, Case No. 15-CV-0366-MJR-PMF, 2016 WL 6248285, at *2 (S.D. Ill. Oct. 26, 2016) (noting that a plaintiff failed to state a viable § 1962(c) claim against U.S. Bank where "the only developed allegations against U.S. Bank accuse it of offering bank accounts to the insuring entities, processing debit transactions, and allegedly rejecting disputes as to certain transactions," which "are U.S. Bank's affairs conducted as a part of its routine

services to customers, and they don't evince participation in the kind of separate enterprise that would trigger racketeering liability"); Super Vision Int'l, Inc. v. Mega Int'l Comm. Bank Co., Ltd., 534 F.Supp.2d 1326, 1338 (S.D. Fla. 2008) ("[B]ankers do not become racketeers by acting like bankers." (internal quotation marks and citation omitted)); Chi, 2014 WL 5019917, at *2 ("Courts have specifically held that where credit card companies are carrying out their business of processing transactions, they are not participating in a RICO enterprise." (footnote omitted)); Rosner v. Bank of China, 528 F.Supp.2d 419, 431 (S.D.N.Y. 2007) ("Rosner's sole allegation is that [the defendant bank] provided banking services that aided in the perpetration of the fraudulent scheme. Regardless of how indispensable or essential such services may have been, rendering a professional service by itself does not qualify as participation in a RICO enterprise."); Acosta v. Campbell, No. 6:04CV7610RL28DAB, 2006 WL 146208, at *6 (M.D. Fla. Jan. 18, 2006) ("In this case, Acosta alleges no more than that MCA found an investor, CitiMortgage/Citibank, who lent him the money to purchase his residence in Florida; that MCA assigned his mortgage to CitiMortgage/Citibank; and MCA required Acosta to sign a substitute Florida-compliant promissory note to replace the original multi-state note that MCA had initially required. These are precisely the sort of activities that MCA and CitiMortgage/Citibank regularly engage in for the purpose of originating, settling, and investing in mortgages; they are not enterprise activities separate and apart from their regular business activities."); Zhu, 2005 WL 2757536, at *5 ("Citibank and FAB do not remotely satisfy [the operation or management] test, as each bank merely transferred funds that the plaintiff re-

quested they transfer. The fact that the money eventually benefited an alleged extortionist has no bearing whatsoever on the banks' limited roles as intermediaries in the transaction. Plaintiff thus also fails to sufficiently allege that the banks were involved in the 'operation or management' of the alleged criminal enterprise."). Plaintiff's allegations here fare no better. Plaintiff's non-conclusory allegations are more consistent with Defendant conducting its own business initiatives as an ODFI, and those types of allegations are not sufficient to plead a RICO enterprise.[7] See Walgreen Co., 719 F.3d at 854–55 (finding that the plaintiffs failed to allege that the defendant pharmacy and drug manufacturers were conducting the affairs of a RICO enterprise, as opposed to their own affairs); Conn. Gen. Life Ins. Co. v. Advanced Surgery Ctr. of Bethesda, LLC, Civil Action No. DKC 14-2376, 2015 WL 4394408, at *14–15 (D. Md. July 15, 2015) (finding that the plaintiffs had not provided sufficient factual allegations to plead a RICO enterprise where "the allegations in the complaint are consistent with [the defendants] carrying out their own business initiatives albeit perhaps in a fraudulent manner," and noting that "[a]lthough the complaint's allegations may indicate that [the defendants] were each engaged in fraudulent conduct, they do not plausibly allege that this was coordinated conduct performed on behalf of a distinct enterprise"); Gomez v. Guthy–Renker, LLC, Case No. EDCV14-01425 JGB (KKx), 2015 WL 4270042, at *8 (C.D. Cal. July 13, 2015) ("[V]ery few courts have been willing to . . . treat allegations of routine commercial relationships as sufficient to support a RICO claim." (collecting cases)).

Plaintiff's allegations implying that Defendant used fraudulent or improper means to carry out the processing activities do not warrant a different result. Even if Defendant used fraudulent means to carry out those activities, the activities constituted Defendant's own business affairs, not acts to further the goals of a separate enterprise. See Singh v. NYCTL 2009–A Trust, 14 Civ. 2558, 2016 WL 3962009, at *10 (S.D.N.Y. July 10, 2016) ("[A] RICO enterprise must be more than a routine contractual combination for the provision of financial services. Without a discernible organization or at least some unitary function, the mere existence of routine business relationships among the defendants is insufficient to establish an enterprise under RICO." (internal quotation marks and citations omitted)); Crissen, 994 F.Supp.2d at 947 ("Mr. Crissen's allegations amount to nothing more than Banco Popular acting as a bank, and extending a line of credit to the Guptas and Wiper so that Gupta and Wiper could purchase properties at Indiana tax sales. Even if Banco Popular used fraudulent means to carry out those activities, those activities constituted Banco Popular's own business affairs and were not, as alleged, acts to further the goals of a separate enterprise."); In re Countrywide Fin. Corp. Mortgage–Backed Secs. Litig., Nos. 2:11–ML–02265–MRP (MANx), 2:11–CV–07166–MRP (MANx), 2:11–CV–09889–MRP (MANx), 2012 WL 10731957, at *8 (C.D. Cal. June 29, 2012) ("Parties that enter commercial relationships for their own gain or benefit do not

---

7. Plaintiff's allegations that it acted as a gatekeeper to the ACH Network and that it warrants to other financial institutions that each ACH entry is properly authorized do not warrant a different result. As Defendant points out, those two allegations "are necessary hallmarks of all ODFI–Originator relationships." (Reply Supp. Mot. Dismiss (Docket Entry No. 87) at 4 (emphasis in original).)

constitute an enterprise." (internal quotation marks and citations omitted)).

In short, Plaintiff's allegations, while creative, essentially attempt to recast a contractual relationship as a RICO enterprise. "The consensus among courts reflects the judgment that the statutory requirements of RICO cannot be circumvented by attempting to characterize a routine contractual relationship for services as an independent enterprise." Gomez, 2015 WL 4270042, at *11 (internal quotation marks and citation omitted); see also AARP v. Am. Family Prepaid Legal Corp., Inc., 604 F.Supp.2d 785, 796 (M.D.N.C. 2009) ("Simple contractual relationships are not ordinarily the stuff of which RICO enterprises are made."). "Allowing such circumvention would not only expand RICO beyond Congress's intent, it would also undermine the integrity of the judicial system by making liability depend on counsel's artful pleading practices, rather than the actual circumstances giving rise to litigation." Gomez, 2015 WL 4270042, at *11. Applying that authority, the Court finds that Plaintiff has not plausibly pleaded a RICO enterprise.[8]

In sum, the Court finds that Plaintiff's non-conclusory allegations are insufficient to plead a plausible RICO enterprise. The Court therefore grants this portion of the Motion to Dismiss.

### b. Management or Control

■ Moreover, to sustain a § 1962(c) claim against Defendant, Plaintiff must allege that Defendant "engaged in criminal activity by means of [its] 'operation and management' of the alleged enterprise." Zhu, 2005 WL 2757536, at *5; see also Patel, 2016 WL 6248285, at *2 ("Each person or entity targeted for liability for a violation of 18 U.S.C. § 1962(c) must have 'participated in the operation or management' of the enterprise, such that it played a role 'in directing the enterprise's affairs' and not just its own operations." (quoting Reves v. Ernst & Young, 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993)); Super Vision Int'l, Inc., 534 F.Supp.2d at 1338 ("[T]he civil RICO defendant must exercise some degree of direction of the enterprise as well as an element of control, and liability depends on showing that the defendants conducted or participated in the conduct of the enterprise's affairs, not just their own affairs." (internal quotation marks and citation omitted)). This test "is a very difficult test to satisfy." Zhu, 2005 WL 2757536, at *5 (internal quotation marks and citation omitted). "[S]imply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject [a defendant] to RICO liability under § 1962(c)." Javitch v. Capwill, 284 F.Supp.2d 848, 854 (N.D. Ohio 2003) (internal quotation marks and citation omitted).

Here, Plaintiff's non-conclusory allegations simply indicate that Defendant transmitted debits originated at the request of the payday lenders to the ACH Network. Those allegations are not sufficient to show that Defendant engaged in the operation or management of the RICO enter-

---

8. As Defendant notes, none of Plaintiff's allegations take Defendant's relationship with CashCall outside the presumption that parties to a commercial contract are acting to further their individual profit interests. (Reply Supp. Mot. Dismiss at 5.) Additionally, Defendant's alleged knowledge of CashCall's wrongdoing does not equate to Defendant and CashCall having a common purpose to engage in a RICO enterprise. Jubelirer, 68 F.Supp.2d at 1053.

prise. See Chi, 2014 WL 5019917, at *2 ("Simply providing financial services or processing credit card transactions is not enough to establish operation or management of an enterprise." (internal quotation marks and footnote omitted)).

Plaintiff's non-conclusory allegations, at most, simply indicate that Defendant carried out the payday lenders' directives, in accordance with a business relationship. Those allegations are not sufficient to satisfy the operation or management test. See Javitch, 284 F.Supp.2d at 854 (noting that a plaintiff had failed to satisfy the operation or management test where the defendant "merely carried out Capwill's directives (and others at Capwill's behest) in accordance with their business relationship"); see also Goren v. New Vision Int'l, Inc., 156 F.3d 721, 728 (7th Cir. 1998) ("[S]imply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject [a defendant] to RICO liability under § 1962(c); instead, the individual must have participated in the operation and management of the enterprise itself."); Montoya v. PNC Bank, N.A., No. 14-20474-CIV, 2014 WL 4248208, at *20 (S.D. Fla. Aug. 27, 2014) (finding that, where the plaintiffs alleged that another defendant paid kickbacks to a bank defendant, "Plaintiffs have only alleged that [the other defendant and the bank] are participating in an enterprise," and "have not sufficiently pled who is directing the affairs of the enterprise").

In sum, Plaintiff failed to plead sufficient non-conclusory allegations to show that Defendant engaged in the management or operation of the alleged RICO enterprise. Plaintiff's § 1962(c) claim consequently fails, and the Court grants the Motion to Dismiss as to that claim.

### 2. Conspiracy

18 U.S.C. § 1962(d) prohibits entering into a conspiracy to commit other RICO violations. 18 U.S.C. § 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."). Here, Plaintiff failed to allege sufficient facts to support her substantive RICO claim, and her RICO conspiracy claim also fails. See Super Vision Int'l, Inc., 534 F.Supp.2d at 1342 ("As articulated by the Eleventh Circuit, where the complaint fails to state a substantive RICO claim, a RICO conspiracy allegation 'simply concludes that the defendants conspired and confederated to commit conduct which in itself does not constitute a RICO violation." (internal quotation marks omitted) (quoting Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1269 (11th Cir. 2004)).

Further, "to state a claim for civil RICO conspiracy, a plaintiff must 'allege an illegal agreement to violate a substantive provision of the RICO statute.'" Super Vision Int'l, Inc., 534 F.Supp.2d at 1342 (quoting Jackson, 372 F.3d at 1269); see also Goren, 156 F.3d at 732 ("[T]o plead a viable § 1962(d) claim, a plaintiff must allege that a defendant agreed to the objective of a violation of RICO." (internal quotation marks and citation omitted)). To satisfy this requirement, "a plaintiff 'must allege facts to support an agreement to violate a substantive provision of the RICO statute.'" Super Vision Int'l, Inc., 534 F.Supp.2d at 1342–43 (quoting Carter v. MGA, Inc., 189 Fed.Appx. 893, 894 (11th Cir. 2006)); see also Fuller v. Home Depot Servs., LLC, 512 F.Supp.2d 1289, 1295 (N.D. Ga. 2007) (noting that to state a RICO conspiracy claim, "the complaint must allege the existence of an agreement 'to commit an act that is itself illegal-

parties cannot be found guilty of conspiring to commit an act that is not itself against the law'" (quoting Jackson, 372 F.3d at 1269)). "Conclusory allegations, accompanied by nothing more than a bare assertion of a conspiracy, do not plausibly suggest a conspiracy." Frederick v. Service Experts Heating & Air Conditioning, LLC, Case No. 2:14-cv-01647-RDP, 2015 WL 6746781, at *8 (N.D. Ala. Nov. 5, 2015) (internal quotation marks and citation omitted). Further, "[a]llegations that the defendants should have known is not enough to establish conspiracy, which is a crime of specific intent." Singh, 2016 WL 3962009, at *10 (internal quotation marks and citation omitted); see also Goren, 156 F.3d at 731–32 ("[T]he RICO conspiracy provision should not be used by the courts to criminalize mere association with an enterprise." (internal quotation marks and citation omitted)).

Here, Plaintiff simply contends, in conclusory fashion, that Defendant and Western Sky "reached an agreement to use their respective roles within the Unlawful Debt Collection Enterprise to profit by facilitating payday loans to borrowers residing in states that banned the practice and collecting usurious interest rates in violation of state law," and this endeavor, if successful, "would constitute the collection of unlawful debts under 18 U.S.C. § 1961(6)." (First Am. Compl. ¶ 135 (internal quotation marks omitted).) Plaintiff asserts that, "[i]n furtherance of their agreement, [Defendant] and Western Sky/CashCall agreed to take certain acts to facilitate the collection of unlawful debts." (Id. ¶ 136.) According to Plaintiff, Defendant "intentionally conspired and agreed with Western Sky/CashCall to use its gatekeeping role as an ODFI in the ACH Network to directly and indirectly conduct and participate in the conduct of the affairs of the Unlawful Debt Collection Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c)." (Id. ¶ 137.) Plaintiff, however, failed to put forth sufficient factual allegations to support those contentions. Under those circumstances, Plaintiff failed to allege sufficiently that Defendant and Western Sky/CashCall reached an agreement to violate a substantive provision of the RICO statute. Plaintiff's RICO conspiracy claim therefore fails, and the Court grants Defendant's Motion to Dismiss as to that claim.

## IV. Conclusion

ACCORDINGLY, the Court **GRANTS** Defendant's Motion for Judgment on the Pleadings [68], and **DISMISSES WITH PREJUDICE** Plaintiff's unjust enrichment claim, as set forth in Count III of the First Amended Complaint, and Plaintiff's claim under the Georgia Payday Lending Act, as set forth in Count IV of the First Amended Complaint. The Court **GRANTS** Defendant's Motion to Dismiss, and **DISMISSES WITH PREJUDICE** Plaintiff's RICO claims set forth in Counts I and II of the First Amended Complaint. The Court **DENIES AS MOOT** Defendant's Motion for Order Setting Status Conference [86]. The Court also **DENIES AS MOOT AND WITHOUT PREJUDICE** Defendant's Requests for Judicial Notice [86–2, 87–1]. Because this Order resolves all of Plaintiff's claims in this action, the Court **DIRECTS** the Clerk to CLOSE this case.

IT IS SO ORDERED, this the 6th day of March, 2017.